283 N.J. Super. 556 (1995)
662 A.2d 1004
FRANCES A. BRADFORD, EXECUTRIX OF THE ESTATE OF MILTON E. BRADFORD, DECEASED, PLAINTIFF,
v.
KUPPER ASSOCIATES, BOROUGH OF TUCKERTON, BOROUGH OF TUCKERTON MUNICIPAL UTILITIES AUTHORITY, OCEAN COUNTY UTILITIES AUTHORITY AND JOHN DOES 1-13 (FICTITIOUS NAMES OF INDIVIDUALS MORE FULLY DESCRIBED HEREIN), DEFENDANTS, AND KUPPER ASSOCIATES, THIRD-PARTY PLAINTIFF-APPELLANT,
v.
AGATE CONSTRUCTION COMPANY, THIRD-PARTY DEFENDANT-RESPONDENT. JOHN E. WARE, PLAINTIFF,
v.
AGATE CONSTRUCTION COMPANY, BOROUGH OF TUCKERTON, BOROUGH OF TUCKERTON UTILITIES AUTHORITY, COUNTY OF OCEAN, COUNTY OF OCEAN UTILITIES AUTHORITY, STATE OF NEW JERSEY, KUPPER ASSOCIATES, JOHN DOE, RICHARD DOE, JOINTLY, SEVERALLY AND/OR IN THE ALTERNATIVE, DEFENDANTS (THREE CASES). FRANCES A. BRADFORD, EXECUTRIX OF THE ESTATE OF MILTON E. BRADFORD, DECEASED, PLAINTIFF-APPELLANT-CROSS-RESPONDENT,
v.
KUPPER ASSOCIATES, DEFENDANT-RESPONDENT-CROSS-APPELLANT, AND BOROUGH OF TUCKERTON, OCEAN COUNTY UTILITIES AUTHORITY AND JOHN DOES 1-13 (FICTITIOUS NAMES OF INDIVIDUALS MORE FULLY DESCRIBED HEREIN), DEFENDANTS, AND BOROUGH OF TUCKERTON MUNICIPAL UTILITIES AUTHORITY, DEFENDANT-RESPONDENT, AND KUPPER ASSOCIATES, THIRD-PARTY PLAINTIFF-RESPONDENT,
v.
AGATE CONSTRUCTION COMPANY, THIRD-PARTY DEFENDANT-RESPONDENT. FRANCES A. BRADFORD, EXECUTRIX OF THE ESTATE OF MILTON E. BRADFORD, DECEASED, PLAINTIFF,
v.
KUPPER ASSOCIATES, BOROUGH OF TUCKERTON, BOROUGH OF TUCKERTON MUNICIPAL UTILITIES AUTHORITY, OCEAN COUNTY UTILITIES AUTHORITY AND JOHN DOES 1-13 (FICTITIOUS NAMES OF INDIVIDUALS MORE FULLY DESCRIBED HEREIN), DEFENDANTS, AND KUPPER ASSOCIATES, THIRD-PARTY PLAINTIFF,
v.
AGATE CONSTRUCTION COMPANY, THIRD-PARTY DEFENDANT. JOHN E. WARE, PLAINTIFF-APPELLANT,
v.
AGATE CONSTRUCTION COMPANY, BOROUGH OF TUCKERTON UTILITIES AUTHORITY, AND KUPPER ASSOCIATES, DEFENDANTS-RESPONDENTS, AND BOROUGH OF TUCKERTON, COUNTY OF OCEAN, COUNTY OF OCEAN UTILITIES AUTHORITY, STATE OF NEW JERSEY, JOHN DOE, RICHARD DOE, JOINTLY, SEVERALLY AND/OR IN THE ALTERNATIVE, DEFENDANTS. FRANCES A. BRADFORD, EXECUTRIX OF THE ESTATE OF MILTON E. BRADFORD, DECEASED, PLAINTIFF,
v.
KUPPER ASSOCIATES, BOROUGH OF TUCKERTON; OCEAN COUNTY MUNICIPAL UTILITIES AUTHORITY, AND JOHN DOES 1-13 (FICTITIOUS NAMES OF INDIVIDUALS MORE FULLY DESCRIBED HEREIN), DEFENDANTS, AND BOROUGH OF TUCKERTON MUNICIPAL UTILITIES AUTHORITY, DEFENDANT-APPELLANT, AND KUPPER ASSOCIATES, THIRD-PARTY PLAINTIFF,
v.
AGATE CONSTRUCTION COMPANY, THIRD-PARTY DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 9, 1995.
Decided August 10, 1995.
*562 Before Judges MICHELS, STERN and KEEFE.
Dennis P. Blake argued the cause for appellant/cross-respondent Frances A. Bradford (Brown & Connery, attorneys; Mr. Blake, on the brief).
Daniel McCormack argued the cause for appellant John E. Ware (Mr. McCormack, on the brief).
Thomas D. Monte, Jr. and Frank E. Borowsky, Jr., argued the cause for appellant/respondent/cross-appellant Kupper Associates (Monte & Marriott, attorneys; Mr. Monte, of counsel; Mr. Borowsky, on the brief).
Thomas M. Masick argued the cause for appellant/respondent Tuckerton Municipal Utilities Authority (Parker, McCay & Criscuolo, attorneys; Stacy L. Moore, Jr., of counsel; Mary Ann C. O'Brien, on the brief).
Lars S. Hyberg argued the cause for respondent Agate Construction Company, Inc. (McAllister, Westmoreland, Vesper & Schwartz, attorneys; Mr. Hyberg, on the brief).
The opinion of the court was delivered by STERN, J.A.D.
*563 Plaintiffs appeal from a judgment of no cause following a jury verdict and a denial of their post-verdict motions for judgment N.O.V. and new trial.[1]
Milton E. Bradford and John E. Ware were employees of Agate Construction Company ("Agate"), which contracted with the Tuckerton Borough Municipal Utilities Authority ("TMUA") to replace and rehabilitate its sewer lines. Kupper Associates ("Kupper") was TMUA's engineer for the project.
It was undisputed that TMUA and Kupper knew of the presence of a poisonous gas, hydrogen sulfide, in the sewer system, but failed to disclose that fact to Agate. Under the contract and applicable regulations, Agate was responsible for the safety at the site and for having appropriate safety equipment for use by its employees. During the construction, however, Bradford was killed and Ware was seriously injured when they inhaled the gas during the course of their employment. Bradford's executrix and Ware filed separate complaints against Kupper and TMUA. Agate was made a third-party defendant in light of its contractual indemnification.[2]
Plaintiffs asserted that Kupper and TMUA breached their duty to warn Agate of the existence of the poisonous gas. The jury found that Kupper had negligently breached its duty to warn, but that its negligence was not a proximate cause of plaintiffs' injuries. The jury also found that TMUA was not liable either because it did not breach a duty which was owed to plaintiffs or because of the absence of proximate cause, or both.
On their appeals, both plaintiffs challenge the trial judge's jury charge regarding proximate cause. They also seek a reversal because the judge failed to charge on the nondelegability of a *564 landowner's duty to warn and on adverse inferences to be drawn from defendants' failure to produce certain witnesses at trial. In its cross-appeal, Kupper argues that its motion for summary judgment should have been granted. We consolidate the separate appeals for purposes of this opinion.
We find no basis to reverse the judgment against plaintiffs and no need for a discussion of some of plaintiffs' contentions. See R. 2:11-3(e)(1)(B), (C), (E).
Kupper and TMUA also appeal the judge's pre-trial determination that Agate was not required, under the construction contract, to indemnify them for expenses flowing from any negligent acts or omissions. Based on the jury's verdict and our affirmance thereof, the issue now has relevance only with respect to the legal fees of Kupper and TMUA. In that respect, we reverse the determination as to indemnification, and remand for further proceedings on that subject alone.

I.
In 1986, TMUA decided to replace and rehabilitate portions of its sewer lines. The project was "primarily financed" by the Farmers Home Administration ("FmHA"), a federal agency within the Department of Agriculture. The FmHA required that its standard contract forms be used with respect to the projects they financed.
On March 6, 1986, TMUA and Kupper executed a FmHA contract whereby Kupper agreed to provide engineering services for the project. Kupper agreed to "conduct preliminary investigations," issue a preliminary engineering report and provide "construction drawings, specifications and contract documents" in connection with the project. The contract required Kupper to "provide general engineering review of the work of the contractors as construction progresses to ascertain that the contractor is conforming with the design concept."
*565 Kupper was to "interpret the intent of the drawings and specifications to protect the OWNER against defects and deficiencies in construction on the part of the contractors," but, as the contract further provided, "[t]he ENGINEER will not ... guarantee the performance by any contractor." Kupper was also, among other obligations, to provide "resident construction inspection." However, the contract also provided that the engineer's responsibilities:
shall not relieve the contractor of [the] contractor's obligation to perform the work in conformity with the drawings and specifications and in a workmanlike manner; shall not make the ENGINEER an insurer of the contractor's performance; and shall not impose upon the ENGINEER any obligation to see that the work is performed in a safe manner.
The contract was approved by the FmHA.
On September 16, 1986, the Ocean County Utilities Authority ("OCUA") wrote to Kupper indicating that OCUA had endorsed the proposed replacement and rehabilitation work because:
the wastewater being discharged into our system from Tuckerton contains hydrogen sulfide in excess of that permitted by our Sewer Use Rules and Regulations. This gas not only has a detrimental affect on this Authority's sewer lines since it is converted to sulfuric acid in the system by bacteria, but also presents a potential health hazard to our employees when they enter our system for inspection and maintenance purposes.
James Parr was Kupper's "project engineer." Parr's pre-construction examination of the Tuckerton sewers revealed that they "were in a state of disrepair" with broken pipes and other "flow" problems. He was shown "massive corrosion" which he was told resulted from the hydrogen sulfide gas. That gas could also be smelled on the streets.
On August 12, 1987, Parr wrote to TMUA and indicated that "pile support systems" were necessary improvements which "could result in further hydrogen sulfide generation." On September 11, 1987, in a letter to the New Jersey Department of Environmental Protection and Energy ("DEPE"), Parr noted, among other things, that "hydrogen sulfide generation is a problem."
It is clear that Kupper, as project engineer, was on notice of the hazardous condition caused by the hydrogen sulfide gas before the construction contract was executed.
*566 Agate was the successful bidder for the construction contract. In March 1988, a construction contract was executed. Section 11 of the FmHA "general conditions" described Agate's responsibilities regarding the safety of work, property, and persons:
11.1 The CONTRACTOR will be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the WORK. The CONTRACTOR will take all necessary precautions for the safety of, will provide the necessary precautions for the safety of, and will provide the necessary protection to prevent damage, injury or loss to all employees on the WORK and other persons who may be affected thereby, all the WORK and all materials or equipment to be incorporated therein, whether in storage on or off the site, and other property at the site or adjacent thereto, including trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.
11.2 The CONTRACTOR will comply with all applicable laws, ordinances, rules, regulations and orders of any public body having jurisdiction. The CONTRACTOR will erect and maintain, as required by the conditions and progress of the WORK, all necessary safeguards for safety and protection. The CONTRACTOR will notify owners of adjacent utilities when prosecution of the WORK may affect them. The CONTRACTOR will remedy all damage, injury or loss to any property caused, directly or indirectly, in whole or part, by the CONTRACTOR, any SUBCONTRACTOR or anyone directly or indirectly employed by any of them or anyone directly or indirectly employed by any of them or anyone of whose acts any of them be liable, except damage or loss attributable to the fault of the CONTRACT DOCUMENTS or to the acts or omissions of the OWNER, or the ENGINEER or anyone employed by either of them or anyone for whose acts either of them may be liable, and not attributable, directly or indirectly, in whole or in part, to the fault or negligence of the CONTRACTOR.
Agate was further required to "supervise and direct the WORK," and to "be solely responsible for the means, methods, techniques, sequences and procedures of construction."
One of the "general conditions" embodied in the FmHA instructions, which were incorporated into the contract, provided that, in order to "protect the lives and health of its employees under the CONTRACT," the contractor was to comply with all provisions promulgated by the Occupational Safety and Health Administration ("OSHA") and any state agency requirements.[3]
*567 Specific "supplementary conditions" in the construction contract dealt with poisonous gases. Sections 7.1 and 7.2 provided:
00807 HAZARDOUS AND TOXIC GASES
7.1 IN ADDITION TO THE SAFETY AND PROTECTION RESPONSIBILITIES OF THE GENERAL CONDITIONS, CAUTION SHOULD BE EXERCISED RELATIVE TO OXYGEN DEFICIENCY, AND THE COLLECTION AND ACCUMULATION OF HAZARDOUS AND TOXIC GASES WHICH MAY BE PRESENT AS A RESULT OF EXISTING GROUND CONDITIONS.
7.2 THE CONTRACTOR SHALL TAKE REQUIRED PRECAUTIONS FOR THE DETECTION OF OXYGEN DEFICIENCY AND TOXIC AND HAZARDOUS GASES AND SHALL PROVIDE THE NECESSARY SAFETY APPARATUS IN GOOD WORKING ORDER IF AND WHEN HAZARDOUS AND TOXIC GASES ARE ENCOUNTERED IN THE WORK.
On April 5, 1988, the parties held a pre-construction conference. In the written memo confirming the conference, no reference was made to any discussion regarding the hydrogen sulfide gas. In fact, Parr's position was that Kupper should not have raised the subject because, under the contracts, that subject was the contractor's responsibility. Nevertheless, in a subsequent letter to Tuckerton Borough's engineer, with a copy to TMUA and others, Parr reported on July 28, 1988, that one of the conditions at the site was that "[h]ydrogen sulfide gases are being generated as a result of the trapped sewage which does not flow."
According to David Vanderslice, one of Agate's heavy equipment operators, on the afternoon of September 6, 1988, Agate employees were getting ready to "clean up" the site as they finished work for the day. Incident thereto, Ware entered a tento-twelve-foot-deep manhole in order to remove the construction "plug" from the sewer line for the night. Vanderslice and William Olsen, Ware's foreman, stood near the entrance of the manhole, when Vanderslice heard "some funny noises" below and concluded that "something's wrong with [Ware]." Olsen and Bradford immediately went into the hole to help Ware. The two men tried to *568 lift Ware out as Vanderslice attempted to grab him from above. However, when Bradford and Olsen "just fell down," Vanderslice recognized that there was a "problem," and he directed coworkers to get a rope and oxygen. After a few minutes, they were able to get Ware out with the help of a ladder. Olsen and Bradford were subsequently removed from the manhole. Bradford died from his injuries.
The medical examiner's opinion as to Bradford's cause of death was "[a]cute stagnant air syndrome and pulmonary congestion." The death certificate identified the cause of death as "asphyxia due to exposure to toxic fumes and stagnant air syndrome." Dr. Walter Corrigan, one of Bradford's experts, testified that the cause of death was "asphyxia due to inhalation of hydrogen sulfide, and probably other gases." Dr. Martin Aronson, another of Bradford's experts, concluded that death resulted from "hydrogen sulfide poisoning."
According to hospital records, Ware remained in a coma for several days after the accident. It was uncontested that Ware suffered "toxic metabolic encephalopathy," brain damage, resulting from a "poisonous substance which affected the blood-flow and/or the oxygen-flow to the brain."
After Ware was ultimately discharged from the hospital, he underwent cognitive rehabilitation in an in-patient rehabilitation facility in early 1989. Ware was told he could return to work in October or November 1989.
Nevertheless, according to Dr. Hugh Anthony Simone, Ware suffered permanent brain damage from the inhalation of the gas that made it difficult for Ware both to learn and to remember. Although the doctor felt that Ware could perform "useful work," he believed that Ware's condition could deteriorate and that he would continue indefinitely to have "memory problems." Around December 1988, Ware and his wife separated.
Both Olsen and Vanderslice testified that, throughout construction, there had been a bad odor at the site daily. Nevertheless, no *569 one had warned them about the possible presence of hydrogen sulfide gas in the sewer lines.
In November 1988, OSHA issued a citation to Agate for failing to maintain a safe work site. OSHA alleged that Agate permitted its employees to be "exposed to confined space hazards of oxygen deficiency and ... flammable gases and vapors and/or toxic air contaminants." It also charged that Agate had failed to instruct its employees "as to the nature of the hazards involved" or to instruct them regarding the "necessary precautions to be taken and in the use of protective and emergency equipment required." It issued directions as to how Agate was to insure future employee safety at the site.
In his deposition which was read to the jury, William Barry, Kupper's "resident engineer," testified that the engineer could not control "the contractor's day-by-day operations." However, he also testified that "noxious gases" were not expected to "accumulat[e]" as a result of plugging the line while construction continued. Barry never smelled the "bad odor" at the site, and he had no idea how it was generated. Moreover, Barry indicated that encountering the gas in sewer repair work was "not normal." He never mentioned any potential hazard to Agate employees because he was not aware of such hazards himself, and was not advised of same by his supervisors.
Parr's depositions were also read to the jury. He visited the job site approximately once a month. Parr was not aware that hydrogen sulfide gas could cause human death, although he understood that "a person could be overcome in a manhole without proper apparatus." Parr also said that Kupper did not "address safety measures, safety aspects" of the job because, under the contract, those were the contractor's obligation. However, he noted that it was Kupper's responsibility to "watch out for its people," and that he expected the contractor to "watch out" for its employees.
According to Parr, Agate was responsible to provide "continuous[,] uninterrupted sewerage service" to the Borough. Due to *570 prior experience at another job, Parr insisted that that provision be in the contract. According to Parr, Agate maintained that bypass pumping would not be necessary at the scene of the accident because no sewer line would be plugged.
Claude V. Baker, Bradford's engineering expert, testified that a proper examination of the concrete sewer lines should have revealed deterioration due to "hydrogen sulfide, being converted to hydrosulfuric acid." He noted that, in certain quantities, hydrogen sulfide gas "causes instant death," "no warning, no anything."
Barry was not a licensed engineer. Therefore, according to Baker, he was not competent to act as the "resident engineer." Baker also believed that both Kupper and TMUA had a "nondelegable duty" to warn of the dangerous condition created by the existence of the poisonous gas. He testified that both Kupper and TMUA should have added a warning to the "drawings themselves" and on "every sheet of the plan" as to the presence and danger of hydrogen sulfide. He also felt that warnings should have been given at the pre-construction conference and at the site. In Baker's opinion, "nothing" in the contracts "relieve[d TMUA or Kupper] of that duty."
Baker also believed that by approving the use of "plugs" during construction, as opposed to employing a "bypass-pumping" technique, Kupper created a deadly situation. Baker felt that the accident "would not have" occurred had by-pass pumping been used the day of the accident. He acknowledged, however, that Agate should also have tested the air inside the manholes as a precautionary measure, and should have had emergency apparatus at the site. He testified that Agate's omissions constituted "a violation of the OSHA regulations."
William Pestalozzi, Agate's project manager and a civil engineer, visited the site approximately two or three times a week. He had no "experience" with hydrogen sulfide gas on any construction project before the accident, and "was not aware of any precautions" taken with respect to the subject site. He noted that he always endeavored to reduce known risks of specific danger. *571 Although no one from FmHA, TMUA or Kupper ever mentioned the existence of hydrogen sulfide gas at the pre-construction conference or otherwise, Pestalozzi indicated that he was aware of an odor around the site, a smell which he referred to as a "bay smell" or a "bay juice odor."
On cross-examination, Pestalozzi admitted that he had not read the construction contract "cover-to-cover," and that, if he had done so, he "would have been alerted to the fact that there was a hazardous and toxic gas potentially present" in light of the specific job specifications. He further acknowledged that the contractor is responsible for the safety of the workers.

II.
Plaintiffs contend that the judge's instructions to the jury were deficient in several respects.
Plaintiffs complain that the jury was confused by the judge's charge on proximate cause. They assert that the judge erroneously charged that, in order to be found liable, defendants' negligence must have been "the" proximate cause. instead of "a" proximate cause. They further contend that the confusion was evidenced by the jury's request for a dictionary and for a re-reading of the judge's charge as to the meaning of the word "proximate."
Defendants assert that the judge properly charged the jury on proximate cause. They point out that there was no objection to the charge, and contend that a single reference to "the" proximate cause was harmless because of the numerous references to the required finding of "a" proximate cause in the charge and the verdict sheet.
There is no dispute before us that "[t]he existence of proximate causes and intervening causes are factual issues which must be resolved by the jury." Davis v. Brooks, 280 N.J. Super. 406, 410, 655 A.2d 927 (App.Div. 1993).
*572 During the charge conference, the trial judge listed the various model jury charges he proposed to read verbatim, including Model Charges 7.10 ("Proximate Cause-General Definition") and 7.11 ("Proximate Cause-Burden of Proof"). Counsel did not object. Model Charge 7.10 provides:
By "proximate cause" it is meant that the negligence of the defendant was an efficient cause of the accident, that is, a cause which necessarily set the other causes in motion and was a substantial factor in bringing the accident about. It is defined as a cause which naturally and probably led to and might have been expected to produce the accident complained of.
Model Charge 7.11 provides:
It is the duty of the plaintiff to establish, by the preponderance of the evidence, that the negligent conduct of the defendant was a proximate cause of the accident and of the injuries alleged to have resulted from it.
Early during the jury charge, the judge stated that "it is the plaintiff's burden to prove that the fault of the defendant was a proximate cause of the accident." Later in the instructions, the judge gave the "Proximate Cause-General Definition" charge substantially as embodied in Model Charge 7.10. He then read the "Proximate Cause-Burden of Proof" charge substantially as embodied in Model Charge 7.11. However, he referred to "the proximate cause," and not "a proximate cause." Immediately thereafter, the judge described comparative fault, noting that it was possible that the jury could find both Kupper and TMUA at fault and "that their fault was a proximate cause of the accident." The judge made clear that "[t]he combined fault of the parties should total 100 percent," if the jurors found "both parties at fault."
On the verdict sheet, the jury was asked whether Kupper's "unreasonable conduct was a proximate cause of the injury to the plaintiffs" and whether "plaintiffs' injuries were proximately caused by the fault of" TMUA. In reviewing the verdict form with the jury, the judge referred to Kupper's or TMUA's "conduct" or "fault" that was allegedly "a proximate cause" of plaintiffs' injuries. Counsel objected to neither the proximate cause charge nor the language in the verdict sheet addressing proximate cause.
*573 During deliberations, the jury asked for a dictionary, and indicated that it wanted "a definition for the word [`]proximate['] only." Counsel for both plaintiffs asked that the definition of "proximate cause" be re-read to the jury. The judge had the jury foreperson come into the courtroom, at which time the foreperson explained that "[a]ll we really wanted ... was the definition of proximate. Proximate. That's all, nothing else."
The judge proposed re-reading the charge on proximate cause, but the foreperson repeated that the only definition they wanted was for the word "proximate." When the judge replied that "proximate only has meaning in the phrase proximate cause," the foreperson stated that the judge was "more knowledgeable about the law than" he was, and returned to the jury room to relate that the judge would re-read the definition of proximate cause if that was what the jury wanted. The jury then told the judge that their "[r]equest is withdrawn."[4]
In their answers to the interrogatories on the verdict sheet, the jury determined that Kupper "failed to take reasonable steps to correct or give warning of the hazardous condition of the premises," but that its conduct was not "a proximate cause" of plaintiffs' injuries. They also found no liability on the part of TMUA.
Where a charge is not objected to at trial, it will only be reversed if there is "plain error." See R. 1:7-2; R. 2:10-2; State v. Hock, 54 N.J. 526, 538, 257 A.2d 699 (1969), cert. denied, 399 U.S. 930, 90 S.Ct. 2254, 26 L.Ed.2d 797 (1970). In deciding that issue, we must review the charge as a whole and determine whether the jury was confused or misled. See State v. Reyes, 140 N.J. 344, 357, 658 A.2d 1218, 1225 (1995). See also Ellis v. Caprice, 96 N.J. Super. 539, 546, 233 A.2d 654 (App.Div.), certif. denied, 50 N.J. 409, 235 A.2d 901 (1967). The absence of an objection suggests that trial counsel perceived no error or prejudice, and, in any event, prevented the trial judge from remedying *574 any possible confusion in a timely fashion. See State v. Wilbely, 63 N.J. 420, 422, 307 A.2d 608 (1973); State v. Macon, 57 N.J. 325, 337, 273 A.2d 1 (1971).
We do not find plain error requiring reversal.
Ellis involved the death or injury to eleven people in a tenement house fire started by a child or children playing with matches. Ellis, supra, 96 N.J. Super. at 543-44, 233 A.2d 654. Plaintiffs sued the landlords under the theory that they had failed "to exercise reasonable care to guard against the hazards of fire." Id. at 547, 233 A.2d 654. During the charge, the judge repeated that the plaintiffs' burden was to prove that defendants' acts or omissions were "the proximate cause" of their injuries, "the efficient cause and the one necessary element which sets the other causes in motion, the one without which the observed effect could not have been followed." Id. at 550, 233 A.2d 654 (emphasis in text). The judge also referred to "proximate cause" in terms of "the" "efficient cause" or "act," as opposed to "a" cause or act. Ibid. In addition, the judge told the jurors that, although a defendant was not relieved from liability for his negligence for foreseeable intervening acts of third persons, "I would say that this would have no application in the instant case because no one could reasonable foresee that the boys were going to light fires in apartments." Id. at 547, 233 A.2d 654 (emphasis omitted). The jury returned a verdict in favor of defendants.
On appeal, we reversed. Noting that the charge was objected to at trial, we concluded that the judge erred both in stating that no one could reasonably foresee that boys would light fires in the apartment and in instructing that the plaintiffs had to prove that the defendants' negligence was the proximate cause of the injuries. Id. at 548-50, 233 A.2d 654. We concluded that the instruction placed an undue burden on plaintiffs, and that they could have satisfied their burden by establishing "either that defendants' negligence was a proximate cause which concurred with the negligence of others to bring about the injuries ... or that it was *575 a substantial factor in bringing them about." Id. at 549, 233 A.2d 654 (emphasis in text).
However, in this case, with one exception, the judge referred to "a" proximate cause whenever he mentioned that phrase. We believe in this context, therefore, the jury understood the judge was giving a general statement or principle when reading Model Charge 7.11 regarding proximate cause. When he talked about the issues in the case, he referred to defendants' negligence in terms of "a" proximate cause. The erroneous reference to "the" proximate cause was both isolated and surrounded by proper statements of the law.
The fact that the jury asked for a definition of "proximate" does not require reversal. The record makes clear that the jury was concerned with the meaning of the word "proximate," and not with the number of parties who could be responsible. In any event, when the judge indicated how he proposed to respond to the jury, as requested by plaintiffs, the jurors withdrew their request. We find no reversible error. See Ellis, supra, 96 N.J. Super. at 546, 233 A.2d 654 ("If, viewed as a whole, the charge presents the law fairly and clearly, the fact that some expressions, standing alone, may be said to be erroneous affords no ground for reversal"). See also Panas v. New Jersey Natural Gas Company, 59 N.J. 255, 258-59, 281 A.2d 520 (1971) (the Court concluded that because counsel promptly objected to the judge's charge about defendant's negligence being "the" proximate cause, instead of "a" proximate cause, and the judge immediately corrected the mistake, the error did not require reversal).

III.
Plaintiffs argue that the judge's failure to charge the jury as to defendants' non-delegable duty to warn of the presence of hydrogen sulfide gas at the site requires reversal. First, they claim that the duty of a landowner and its agents to warn of a hidden danger on the property is not, as a matter of law, delegable. They also contend that once the judge initially indicated that he would *576 so charge the jury, plaintiffs planned their trial strategy accordingly. They, therefore, allege that, even if the judge's failure to give the non-delegability-of-duty charge was not erroneous in itself, his failure to ultimately give the charge unfairly prejudiced their trial strategy.
With respect to Kupper, the judge charged:
Where the engineer knows of an unsafe condition, he may satisfy his duty by correcting that unsafe condition, or in those circumstances where it is reasonable to do so, by giving warning to the invitee of the unsafe condition.
As set forth in Sanna v. National Sponge Company, 209 N.J. Super. 60, 67, 506 A.2d 1258 (App.Div. 1986), he also charged the jury that:
the duty to provide a reasonably safe place to work is relative to the nature of the invited endeavor and does not entail the elimination of operational hazards which are obvious and visible to the invitee under ordinary observation and which are part of or incidental to the very work the contractor was hired to perform.
In Carvalho v. Toll Brothers and Developers and Bergman Hatton Engineering Associates, 278 N.J. Super. 451, 455, 651 A.2d 492 (App.Div. 1995), certif. granted, 140 N.J. 326, 658 A.2d 726 (1995), we had to decide:
whether an engineer who supervised the [sewer installation project] on behalf of the [municipality-] owner and who had no contract obligation to inspect for safety hazards, nevertheless owed [an employee of the excavation subcontractor] a duty to take some reasonable action to prevent [this employee's] injury when the engineer [had] actual knowledge of the dangerous condition
....
We noted that "an engineer or architect may owe a duty, despite the absence of any contractual obligations concerning safety, when the professional has actual knowledge of a dangerous condition to which the job-site workmen are exposed," and held that the engineer "owed a duty to `take some reasonable action to prevent injury' to workers exposed to the dangerous thirteen-foot deep trench" which collapsed and crushed the employee in question. Id. at 460-61, 651 A.2d 492. We further concluded that the absence of a contractual provision imposing such responsibility did not mean that the engineer was released from the duty to "exercise reasonable care to take some action when unique circumstances *577 present at the job site demand such action." Id. at 462, 651 A.2d 492.
But this court in Carvalho reversed the grant of summary judgment for an engineer while, here, we are addressing a circumstance where the trial judge expressly charged the jury that where the engineer knows of an unsafe condition, he may satisfy his obligation to third parties by either correcting the condition or, where appropriate, warning of its presence. That instruction adequately apprised the jury of Kupper's duty. See also Kane v. Hartz Mountain Industries, Inc., 278 N.J. Super. 129, 141-44, 650 A.2d 808 (App.Div. 1994), certif granted, 141 N.J. 95, 96, 660 A.2d 1194 (1995). Cf. Strawn v. Canuso, 140 N.J. 43, 65, 657 A.2d 420 (1995) (obligation of real estate seller and broker to warn of known off-site conditions which materially affect the property).
In any event, we conclude that any error was harmless as to Kupper because of the jury's finding that Kupper was, in fact, negligent in failing to correct or warn of the hazardous condition on the property. Cf. Sanders v. Wheaton, 273 Ark. 416, 619 S.W.2d 674 (1981). Kupper escaped liability only because of the jury finding of no proximate cause. The jury's finding of negligence reflects its determination that Kupper breached a duty of care.
The judge also charged the jury regarding TMUA's duty to warn:
When you are bringing suit or claim against a public body, such as the Tuckerton Municipal Utilities Authority, there are different laws that apply, and I will now explain to you the laws that apply in this case.
The plaintiffs here charge that the presence of hydrogen sulfide in the sewer lines of the Tuckerton Municipal Utilities Authority created a dangerous condition of public property and that the dangerous condition was a proximate cause of plaintiffs' injuries.
........
A public entity is responsible for injuries proximately caused by a dangerous condition of its property. The phrase "dangerous condition" has a particular meaning.

*578 In order for you to find that there was a dangerous condition of public property, you must be satisfied by a fair preponderance of the credible evidence that all of the following things were true at the time of the plaintiffs' injury:
First, that the condition was one that created a substantial risk of injury, a risk that was not a minor, trivial or insignificant risk, but a substantial risk.
The risk of injury was to a person that would be using the public property with due care; that is, reasonable care for his own safety and in a manner that the public entity ought to have reasonably foreseen or expected from people who would use the property.
........
Number 2, that the condition was one that created a reasonably foreseeable risk of the kind of injury sustained by the plaintiffs. It need not be of exactly the same kind, but it must be an injury of that same class, order or type.
The third element is that the condition was such that the defendant had actual or constructive notice of the dangerous condition a sufficient time prior to the injury to have taken measures to repair, remedy or correct it, or to provide safeguards or to warn of the condition.
The defendant had actual notice of the dangerous condition if you are satisfied defendant actually knew the condition existed and knew or should have known of its dangerous character.
The defendant had constructive notice of the condition if you are satisfied the condition had existed for such a period of time and was of such obvious nature that the public entity in the exercise of due and reasonable care should have discovered the condition and its dangerous character.
[Fourth], that the action the defendant took or his failure to take action to repair, remedy or correct the condition, or to provide safeguards, or to warn of the condition was palpably unreasonable.
It must be such that mere careless or thoughtless or forgetful or inefficient is not enough. It must be more than merely careless or thoughtless or forgetful or inefficient.
To be palpably unreasonable, it must be action or inaction that is plainly and obviously without reason or reasonable basis. It is capricious, arbitrary or outrageous.
N.J.S.A. 59:4-2 provides:
A public entity is liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:
a. a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or

*579 b. a public entity had actual or constructive notice of the dangerous condition under section 59:4-3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.
Nothing in this section shall be construed to impose liability upon a public entity for a dangerous condition of its public property if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable.
We believe that the charge was adequate as to TMUA, and note that plaintiffs did not suggest otherwise at the time. Moreover, in its answer to the interrogatory on the verdict sheet, the jury found that TMUA was not liable either because it did not breach a duty which was owed to plaintiffs under the above-cited Tort Claims Act standards, because its conduct was not a proximate cause of plaintiffs' injuries, or both. Cf. Black v. Borough of Atlantic Highlands, 263 N.J. Super. 445, 451-52, 623 A.2d 257 (App.Div. 1993).[5] The TMUA contracted with an engineer and contractor to rehabilitate the sewer system and remedy any dangerous condition. In any event, it relied upon the professional expertise of the engineer whose failure to warn was not a proximate cause of the plaintiffs' injuries.
Plaintiffs, nevertheless, claim that their "strategy on examinations, and [on] opening and closing arguments[,] relied on the trial judge's assurances" that the non-delegable duty charge would be given, and that they were, therefore, prejudiced by its absence. However, even if the judge's charge did not address the non-delegability of the duty to warn in terms expected by plaintiffs, they fail to sufficiently particularize the resulting prejudice. But cf. Blitz v. Hutchinson, 252 N.J. Super. 580, 591-94, 600 A.2d 485 (App.Div. 1991) (the trial judge's assurance that he would charge under Anderson v. Somberg, 67 N.J. 291, 338 A.2d 1, cert. denied, 423 U.S. 929, 96 S.Ct. 279, 46 L.Ed.2d 258 (1975), led plaintiff not *580 to cross-examine certain witnesses; there, Judge (now Justice) Coleman wrote "[c]hanging the allocation of the burden of proof after essentially all of the evidence has been presented will invariably lead to substantial prejudice ... Few issues occur during a trial that are more important or more fundamental than the burden of proof").

IV.
Plaintiffs also claim that the judge erred in denying their request to give the jury an adverse inference charge as to defendants' failure to elicit testimony from their employees and experts. The judge concluded that the requested charge was inappropriate because depositions had been taken and were available for introduction by plaintiffs. In fact, the depositions of Parr and Barry were read to the jury. Further, the judge ruled that plaintiffs' counsel could comment during summation on the non-production of other witnesses.
During summations, both plaintiffs' counsel referred to defendants' failure to produce witnesses, including an expert who defendants had hired to issue a report.
Plaintiffs could have subpoenaed the potential defense witnesses, and they so acknowledged to the trial judge at least with respect to the non-experts. In any event, we find no abuse of discretion by the trial judge in denying the request. See Anderson v. Somberg, 158 N.J. Super. 384, 395, 386 A.2d 413 (App.Div.), certif. denied, 77 N.J. 509, 391 A.2d 522 (1978). Moreover, the failure of a party to call an expert who was earlier deposed "does not normally justify an adverse inference charge." McQuaid v. Burlington County Memorial Hospital, 212 N.J. Super. 472, 476, 515 A.2d 796 (App.Div. 1986). See also Anderson, supra, 158 N.J. Super. at 395, 386 A.2d 413.

V.
Plaintiffs argue that the trial judge abused his discretion in denying their motion for a judgment N.O.V. or for a new *581 trial. However, we cannot reverse the trial judge's denial of such a motion unless "it clearly appears that there was a miscarriage of justice under the law." R. 2:10-1. See Carrino v. Novotny, 78 N.J. 355, 358-61, 396 A.2d 561 (1979); Dolson v. Anastasia, 55 N.J. 2, 7, 258 A.2d 706 (1969). Moreover, our scope of review is limited. See Carrino, supra, 78 N.J. at 360-61, 396 A.2d 561; Kulbacki v. Sobchinsky, 38 N.J. 435, 444-45, 185 A.2d 835 (1962).
Plaintiffs argue that the jury's verdict was against the weight of the evidence. Although there may have been evidence from which the jury could have concluded that the acts or omissions of Kupper and TMUA contributed to plaintiffs' injuries in whole or in part, we cannot conclude that the judge improperly denied the motion. It may be that plaintiffs are limited to their workers' compensation remedy, but that fact does not require us to conclude, as a matter of law, that the conduct of either defendant was a proximate cause of their injuries.
Agate's project supervisor, Pestalozzi, testified that the contractor was responsible for its employees and for the safety on the job, and that if he had read the contract "cover-to-cover" prior to the accident, he "would have been alerted to the fact that there was a hazardous and toxic gas potentially present." Agate's job foreman, Olsen, acknowledged that Agate was responsible for the workmen's safety at the site, that he never read the contract, that he was unaware of the provision relating to OSHA requirements therein, and that Agate did not have all the safety equipment necessary for work in confined spaces. Furthermore, plaintiffs' expert, Baker, acknowledged that Agate should have tested the air and should have had breathing apparatus and safety equipment at the site. He also acknowledged that Agate's omissions amounted to a violation of OSHA standards.
In essence, we cannot overrule the trial judge and conclude that the jury could not find that, but for Agate's negligence, this accident never would have occurred. That being the case, we find that the post-verdict motion was not improperly denied.

*582 VI.
TMUA and Kupper seek a reversal of the judge's pre-trial dismissal of their indemnification claims against Agate. Although our affirmance saves them from liability for injuries either to Bradford or to Ware, they seek reimbursement for attorneys' fees and costs of litigation.
Kupper and TMUA argue that the relevant contract document clearly sets forth that Agate must indemnify them for losses for which they were not wholly responsible, and that, given both the OSHA citation to Agate and other proofs adduced at trial, the verdict reflects the jury's finding that Agate was at least partially responsible for plaintiffs' inquiries.
In granting Agate's motion to dismiss, the trial judge noted that, while a contractor may be required to assume the duty to indemnify another party in connection with a construction project, such an intent "must be expressed in unequivocal terms." Relying upon Ramos v. Browning-Ferris Industries of South Jersey, Inc., 103 N.J. 177, 510 A.2d 1152 (1986), the judge concluded that the contract governing this project did not clearly place upon Agate the duty to indemnify the project owner and engineer "from what may be their own negligence." He, therefore, granted Agate's motion to dismiss the claims against it premised on the negligence of TMUA and Kupper. As employees of Agate, plaintiffs could not recover against it for Agate's own negligence.
N.J.S.A. 2A:40A-1 provides:
A covenant, promise, agreement or understanding in, or in connection with or collateral to a contract, agreement or purchase order, relative to the construction, alteration, repair, maintenance, servicing, or security of a building, structure, highway, railroad, appurtenance and appliance, including moving, demolition, excavating, grading, clearing, site preparation or development of real property connected therewith, purporting to indemnify or hold harmless the promisee against liability for damages arising out of bodily injury to persons or damage to property caused by or resulting from the sole negligence of the promisee, his agents, or employees, is against public policy and is void and unenforceable; provided that this section shall not affect the validity of any insurance contract, workmen's compensation or agreement issued by an authorized insurer.
*583 In light of this statute, we have held that parties to a construction contract "may no longer agree that the indemnitor shall indemnify the indemnitee for injuries caused by the sole negligence of the indemnitee." Grippo v. Schrenell and Co., 223 N.J. Super. 154, 164, 538 A.2d 404 (App.Div. 1988). A similar statute expressly extends the prohibition against the indemnitee assuming liability for the sole negligence of architects, engineers and surveyors. See N.J.S.A. 2A:40A-2.
Paragraphs 24.1 and 24.2 of the construction contract provides:
24. INDEMNIFICATION
24.1 The CONTRACTOR will indemnify and hold harmless the OWNER and the ENGINEER and their agents and employees from and against all claims, damages, losses and expenses including attorney's fees arising out of or resulting from the performance of the WORK, provided that any such claims, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property including the loss of use resulting therefrom; and is caused in whole or in part by any negligent or willful act or omission of the CONTRACTOR, and SUBCONTRACTOR, anyone directly or indirectly employed by any of them or anyone for whose acts any of them may be liable.
24.2 In any and all claims against the OWNER or the ENGINEER, or any of their agents or employees, by any employee of the CONTRACTOR, any SUBCONTRACTOR, anyone directly or indirectly employed by any of them, or anyone for whose acts any of them may be liable, the indemnification obligation shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for the CONTRACTOR or any SUBCONTRACTOR under workmen's compensation acts, disability benefit acts or other employee benefits acts.
[Emphasis added.]
Where the indemnitor agrees to indemnify for the indemnitee's own negligence, the promise must be clearly expressed. See Ramos, supra, 103 N.J. at 191, 510 A.2d 1152; Carvalho, supra, 278 N.J. Super. at 464-65, 651 A.2d 492. Agate insists that its indemnification cannot be construed to cover TMUA and Kupper for their own negligence.
The construction of a contract such as the one before us is a matter of law. See Anthony L. Petters Diner, Inc. v. Stellakis, 202 N.J. Super. 11, 27-28, 493 A.2d 1261 (App.Div. 1985). See also Ramos, supra. Here, Agate agreed to indemnify both TMUA and Kupper for "all claims, damages, losses ... arising out of or *584 resulting from the performance of the WORK, provided that [such claims] ... [are] caused in whole or in part by any negligent or willful act or omission of the CONTRACTOR, and SUBCONTRACTOR, anyone directly or indirectly employed by any of them or anyone for whose acts any of them may be liable."
This indemnification provision clearly did not require Agate to indemnify only for its own negligence. See Stier v. Shop Rite of Manalapan, 201 N.J. Super. 142, 150-51, 492 A.2d 1055 (App.Div. 1985). See also Curtis T. Bedwell and Sons, Inc. v. Geppert Bros., Inc., 280 N.J. Super. 391, 398, 655 A.2d 483 (App.Div. 1995). But neither did it provide for indemnification of either TMUA or Kupper solely based upon their exclusive negligence. Some negligence on the part of the indemnitor Agate, one of its subcontractors or one of their respective agents or employees was required. But where any of these actors were partially or wholly responsible, indemnification was guaranteed. Hence, Agate was not indemnifying the owner or engineer even in the absence of any culpability by Agate's employees, agents or subordinates on the job, a significant factor in interpreting the intent of the agreement. Compare the indemnification provisions in Ramos, supra, 103 N.J. at 182, 510 A.2d 1152; Carvalho, supra, 278 N.J. Super. at 463, 651 A.2d 492.[6]See also Stier, supra, 201 N.J. Super. at 150-51, 492 A.2d 1055.
In any event, given the requirement of some negligence by Agate or its subcontractors or their agents, the indemnity clause does not protect TMUA or Kupper from their exclusive negligence, and is, therefore, enforceable. Cf. Secallus v. Muscarelle, 245 N.J. Super. 535, 536-37, 586 A.2d 305 (App.Div.), aff'd, 126 N.J. 288, 597 A.2d 1083 (1991) (subcontract read to indemnify the contractor for its "liability for damages caused in part by the negligence of others than" the contractor). As stated by this court in Secallus:

*585 a promise to indemnify for sole negligence is unenforceable, whereas a promise to indemnify for 99% negligence may be enforced. Yet this is precisely what is called for by the plain and unmistakable language of [N.J.S.A. 2A:40A-1].
[Id. at 537, 586 A.2d 305.]
The claims clearly arose or resulted from "the performance of the WORK." We reject Agate's contention to the contrary. Moreover, as the indemnification provision expressly included indemnification from "expenses including attorney's fees arising out of or resulting from the performance of the WORK," TMUA and Kupper were entitled to indemnification for the counsel fees which were a result of the "claims ... arising out of ... the performance of the WORK."
After the trial judge granted Agate's motion, Kupper urged that the jury should, nevertheless, be required to assess Agate's comparative fault for purposes of the indemnification issue. Agate insisted, and continues to maintain, that the workers' compensation bar prohibited submission to the jury of any interrogatory concerning the employer's liability. The judge responded that, under Ramos, "[y]ou don't send the issue of the employer['s] [negligence] to the jury for comparison or other purposes."
Agate relies on Ramos which held that a tort-feasor cannot obtain contribution from a negligent employer and that the workers' compensation law also precludes the jury from considering an employer's negligence under the Comparative Negligence Act, N.J.S.A. 2A:15-5.2b. This is so even if, as the indemnitee argued there, the "jury could better compare [the indemnitee's] negligence to that of plaintiff if it also considered [the indemnitor's] negligence." Ramos, supra, 103 N.J. at 193, 510 A.2d 1152. However, a third-party tort-feasor can recover against an employer when, as here, the parties have executed an indemnification agreement. As we recently stated:
Although a third-party tortfeasor cannot seek contribution from an employer, it may obtain indemnification where that course is specifically permitted by way of an express contract. The [Workers Compensation] Act does not preclude the employer's *586 assumption of a contractual duty to indemnify a third party through an express agreement.
[Port Authority v. Honeywell Prot. Services, Honeywell, Inc., 222 N.J. Super. 11, 19, 535 A.2d 974 (App.Div. 1987) (citing Ramos, supra, 103 N.J. at 191, 510 A.2d 1152).]
Thus, a determination regarding the negligence of Agate was relevant for purposes of triggering the indemnification which was based on at least some negligence by Agate. See White v. Newark Morning Star Ledger, 245 N.J. Super. 606, 609-11, 586 A.2d 341 (Law Div. 1990).
We see significant issues which could flow from the obligation to indemnify, including which party has the obligation to defend in the absence of an agreement which requires a defense, and the need for separate proceedings where there is an issue as to whether the indemnitee's sole negligence is involved or the indemnitor's obligation was triggered by its own negligence. The matter may be best resolved, as TMUA and Kupper sought here, by keeping the indemnitor in the case on the indemnification claim. But we need not now decide what the judge should have done had he denied Agate's motion. Rather, we have to determine what we must do in light of the fact that he granted the motion, and we must do so in view of the established record. Of particular importance are the determinations that neither TMUA nor Kupper were found liable, although Kupper was found to be negligent.
Here, Agate chose not to participate by moving for a dismissal of the third-party claims. Rather, it sought to be relieved of an obligation to become involved in the trial proceedings.
In these circumstances, taking account of the proofs that Agate violated OSHA regulations, and given a jury verdict finding neither defendant liable for plaintiffs' work-related injuries, we are unprepared to permit Agate to re-litigate the issue of negligence or whether either TMUA or Kupper can be said to be solely negligent.
*587 When counsel fees are sought under an indemnification agreement, the request generally must be included in the prayer for damages and proven at trial. See Specialized Medical Systems v. Lemmerling, 252 N.J. Super. 180, 182 n. 3, 599 A.2d 578 (App.Div. 1991), certif. granted, 127 N.J. 565, 606 A.2d 375 (1992), appeal dismissed, 142 N.J. 443, 663 A.2d 1354 (1993); Central Motor Parts Corporation v. E.I. duPont de Nemours & Co., Inc., 251 N.J. Super. 5, 9-13, 596 A.2d 759 (App.Div. 1991). See also Cohen v. Fair Lawn Dairies, Inc., 86 N.J. Super. 206, 206 A.2d 585 (App.Div.), aff'd, 44 N.J. 450, 210 A.2d 73 (1965). But see R. 4:42-9(a)(6) regarding a claim under an indemnity policy of insurance. Here, both Kupper and TMUA filed pleadings seeking contractual indemnification from Agate. Therefore, their indemnification claims were preserved.
We are unaware of the position of the parties, however, as to whether a plenary trial is now required on the claim for counsel fees and litigation costs in light of our affirmance of the judgment and the limited subject to be covered under the indemnification provision. We leave for the trial judge to decide, after hearing from counsel, whether a plenary trial is required. See Cohen, supra, 44 N.J. at 452, 210 A.2d 73.[7]
Accordingly, we remand to the trial judge consideration of all the issues regarding attorneys' fees and costs for which TMUA and Kupper are entitled under the indemnification clause.

VII.
We affirm the judgments in favor of TMUA and Kupper on plaintiffs' complaint. We reverse the dismissal of indemnification *588 claims with respect to TMUA's and Kupper's legal fees, and remand for a hearing on those fees. We do not retain jurisdiction.
NOTES
[1] The record reflects an order dated October 22, 1993, denying a motion for judgment N.O.V. or new trial, but no final judgment.
[2] Ware's direct action against Agate was dismissed.
[3] Bradford's appendix reflects that the above-quoted "instructions" and "conditions" were among those also incorporated into TMUA's contract with Kupper. The Bradford appendix does not include, as part of the TMUA-Kupper agreement, the contractor's indemnification clause contained in paragraph 24 of the construction contract. We find that such incorporation of paragraph 11.2 does not affect the indemnification issue, particularly in light of its concluding language.
[4] No issue is raised with respect to the colloquy with the foreperson outside the presence of the other jurors.
[5] We cannot tell the reason for the jury's conclusion. The interrogatory may be inadequate in not breaking the issues down further, as plaintiffs now assert. However, there was no objection raised at trial. We find no basis for reversal for plain error on the ground that it is unclear whether the conclusion was based on a finding of no breach of duty under the Tort Claims Act, or that TMUA's breach of duty was not a proximate cause of plaintiffs' injuries, or both.
[6] Further, here, unlike Carvalho, the indemnity clause expressly covered the engineer.
[7] This is not the occasion to consider whether counsel fees permitted by contract can be awarded under R. 4:42-9, an issue not resolved in Cohen and apparently assumed but not fully developed in Lemmerling. See also Szczepanski v. Newcomb Medical Center Inc., 141 N.J. 346, 661 A.2d 1232 (1995).