688 A.2d 1069

ROBERT L. YOUNG, PLAINTIFF–APPELLANT, v. THE PRUDEN-TIAL INSURANCE COMPANY OF AMERICA, INC., A CORPO-RATION OF THE STATE OF NEW JERSEY; FRED FABOZZI, INDIVIDUALLY AND AS AN OFFICER, AGENT REPRESEN-TATIVE AND/OR EMPLOYEE OF THE PRUDENTIAL INSUR-ANCE COMPANY OF AMERICA, INC.; AND AVEN A. KERR, INDIVIDUALLY AND AS AN OFFICER, AGENT, REPRESEN-TATIVE AND/OR EMPLOYEE OF THE PRUDENTIAL INSUR-ANCE COMPANY OF AMERICA, INC., DEFENDANTS–RE-SPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued October 1, 1996—Decided February 14, 1997.

Before Judges PRESSLER, HUMPHREYS and WECKER.

*Lawrence P. Cohen* and *Kevin M. Hahn* argued the cause for appellant (*Courter, Kobert, Laufer & Cohen*, attorneys; *Mr. Hahn* on the brief).

*Alan E. Kraus* argued the cause for respondent The Prudential Insurance Company of America (*Riker, Danzig, Scherer, Hyland & Perretti*, attorneys; *Mr. Kraus* on the joint brief filed by respondents).

*Cynthia J. Borrelli* argued the cause for respondents Fred Fabozzi and Aven A. Kerr (*Bressler, Amery & Ross*, attorneys; *J. Michael Riordan* on the joint brief filed by respondents).

The opinion of the court was delivered by

WECKER, J.S.C. (temporarily assigned).

Plaintiff Robert Young appeals from an order dismissing his complaint against his former employer, defendant Prudential Insurance Company of America, Inc., and two supervisory employees, defendants Fred Fabozzi and Aven Kerr, without prejudice on the ground that Young was contractually bound to arbitrate his claims. Young's complaint alleges violations of the Conscientious Employee's Protection Act, *N.J.S.A.* 34:19-1 ("CEPA"), and the New Jersey Law Against Discrimination, *N.J.S.A.* 10:5-1 et seq. ("LAD"), arising out of his employment and termination by Prudential.

This appeal involves the enforceability of the arbitration provision contained in a securities registration application and the scope of the incorporated arbitration rules of the National Association of Securities Dealers ("NASD"), particularly the so-called "insurance exception" of the NASD Code of Arbitration Procedure ("Code").

· We have carefully reviewed the arguments of counsel in light of the applicable law and conclude that although the arbitration provision is a valid and binding agreement, Young's claim under CEPA involves precisely the sort of "insurance business" that the

NASD Code excepts from arbitration. We therefore reverse the dismissal as to plaintiff's CEPA claim. We affirm the dismissal without prejudice as to plaintiff's LAD claim.

## I

These facts are undisputed. Young began working for Prudential in 1973. In 1982, while employed as a life insurance sales representative for Prudential, and because of Prudential's expansion into the securities market, plaintiff was required to take an examination and to register with the NASD as a condition of his continued employment. The NASD is a self-regulatory organization of securities brokers and dealers, as defined by 15 *U.S.C.A.* § 78c(a)(26), subject to regulation by the Securities and Exchange Commission ("SEC"). *See generally,* 15 *U.S.C.* § 78b. et seq. Registration required individuals such as Young to sign and submit a Uniform Application for Securities Industry Registration known as the "Form U–4" and to pass an examination. The development and use of the Form U–4 is explained in an opinion of Judge (now Justice) Ginsburg in *Ass'n. of Inv. Brokers v. Securities & Exchange Comm'n.,* 676 *F.*2d 857, 859 (D.C.Cir.1982) ("Form U–4 is in general use throughout the securities industry.") The U–4 calls for the applicant to supply personal and professional data and to undertake several promises, including a promise to arbitrate certain disputes. Young twice completed and signed the U–4, once in February 1982 and again in April 1983. Prudential is a member of the NASD and is named as Young's employer on each U–4 signed by him.

In or about June 1982 Young became the manager of a Prudential field office in Metuchen. In 1991 defendant Fred Fabozzi, Young's direct supervisor, requested him to transfer to the Warren Hills office. It was after his transfer to Warren Hills that Young alleges he discovered a widespread, illegal insurance sales practice he calls "churning." He contends that his attempts to stop the practice were rebuffed by Fabozzi and Prudential. Young further contends that he was similarly rebuffed when he

complained about a compensation policy that charged all refunds issued to customers for past transactions against the earnings of all current sales representatives in the office. This policy, according to Young, was designed to cover up past churning activities by creating a financial disincentive for sales representatives to report past instances of churning that would require them to refund losses or otherwise reimburse customers.

Young claims in this action that as a result of pressures imposed upon him by Prudential in direct response to his open criticism of the churning problems and the cover-up policy, he suffered disabling depression and in October 1994 took a medical leave and began receiving disability benefits from Prudential. With respect to the individual defendants, plaintiff claims that in early December 1994 Fabozzi notified him in writing that he was being placed on probation as a result of three separate incidents claimed to have occurred in 1991, 1992 and 1994. According to plaintiff, in February 1995 defendant Aven Kerr signed the letter of termination on behalf of Prudential and referred to an "investigation into claims and complaints from employees of the Warren Hills office concerning your behavior towards the staff." Plaintiff's disability benefits were terminated as well.

Plaintiff filed this action in May 1995 alleging that defendants violated CEPA first by placing him on probation and then by firing him and cutting off his disability benefits, all in retaliation for his internal company efforts to report and stop what he reasonably believed to be illegal insurance sales practices.[1]

Young's complaint describes in some detail the allegedly unlawful insurance practices he claims to have observed and opposed:

13. FABOZZI's representations of "fine opportunities for favorable progress" at the Warren Hills office were misleading because of liabilities and problems which existed within that office. Defendant knew of the liabilities and problems (involving certain illegal sales practices commonly referred to in the insurance industry as

---

[1] Young's LAD claim alleges that his psychological injury qualifies him as "handicapped" and that the termination of his disability benefits as well as the termination of his employment constitute discrimination in violation of LAD.

"churning") which existed at the Warren Hills office prior to the Plaintiff's transfer, yet they intentionally failed and refused to inform Plaintiff of these matters in order to induce him to accept the transfer.

14. Plaintiff was unaware that certain agents and employees of the Warren Hills office were engaged in "churning" activity. Churning activity involves a sales tactic, usually directed at older policyholders, who are encouraged to purchase new insurance policies based on the misrepresentation of a sales agent that premiums due on the new insurance policies would be satisfied from dividends paid by PRUDENTIAL to the policyholder on older insurance policies already owned by the policyholders. The sales agent, in making these false representations to the policyholder, would know that the representations were false; but would make the representation anyway, for the sole purpose of inducing the policyholder to purchase a new insurance policy. Although premiums due on the new policy would initially be satisfied from the dividends on the old policies, eventually the dividends would no longer be sufficient to pay the premiums. Thereafter, loans against the cash surrender value of the insurance policies would be arranged by PRUDEN-TIAL'S sales agent without the knowledge of the policyholder; and these loans would then be used to satisfy the premiums which became due. Eventually the original insurance policies would become virtually worthless.

. . . .

16. The churning activity which was taking place in the Warren Hills office at the time Plaintiff was transferred to that office was, on information and belief, in fact encouraged by PRUDENTIAL, and its high level employees (including the former manager of the Warren Hills office and FABOZZI), as a means by which to increase sales.

17. The churning activity described above without specific notice to the policyholders is prohibited by law as well as being a totally dishonest and illegal sales practice perpetrated as against innocent and unsuspecting policyholders.

18. Shortly after his transfer to the Warren Hills office, Plaintiff discovered the rampant churning activity which was taking place within the office. Recognizing the churning activity to be an illegal sales practice, Plaintiff, as general manager of the Warren Hills office:

(i) reported incidents of churning to the attention of FABOZZI, as his immediate supervisor, with a recommendation that all such activities cease;

(ii) reprimanded individual sales agents for engaging in churning activities and vigilantly guarded against sales agents engaging in such activities in the future;

(iii) insisted that all policyholders affected by the churning activities (whether the policyholders in question had registered complaints with PRUDENTIAL or not) be reimbursed for all premiums which had wrongfully been charged and collected for the new policies; and

(iv) protested against PRUDENTIAL'S policy (the "Churning Policy") of charging the Warren Hills office with return premiums, earned through churning activity, rather than charging such return premiums against the guilty sales agents and/or prior sales managers who had encouraged, and participated in, the

churning, especially since many were no longer employed at the Warren Hills office.

19. Defendants refused to accept Plaintiff's recommendations, and elected, instead, to deal with the churning problem on an *ad hoc* basis, returning premiums only to those policyholders who were sufficiently informed of the problem, and astute enough, to file a formal complaint with PRUDENTIAL.

20. The adoption of the Churning Policy by the Defendants and the intended purpose and result was calculated to discourage honest employees from reporting churning activities of dishonest employees working for Plaintiff presently, and previously, since the result of such honesty and forthrightness would be a decrease in their income.

21. Additionally, the Churning Policy was calculated to contain, and cover up, the churning practices of PRUDENTIAL for the purpose of:

(i) maintaining a high level of sales;

(ii) avoiding the loss of good will and public confidence which could flow from negative publicity;

(iii) avoiding civil and/or criminal charges which could result from widespread disclosure; and,

(iv) avoiding catastrophic consequences which could result from any large scale return of premiums to previously unsuspecting policyholders.

22. When Plaintiff, as the general manager of the Warren Hills office, protested the Churning policy to his immediate supervisor, FABOZZI (whose title was Vice President of Regional Marketing), he was told by FABOZZI that the Churning Policy would not be altered by PRUDENTIAL and that Plaintiff should stop complaining.

23. Because Plaintiff was outspoken about the churning activities; and, because of his attempts to convince the Defendants to discontinue the Churning Policy as an inherently unfair employment practice; Plaintiff, despite his twenty years of service to PRUDENTIAL, came to be held in disfavor by the Defendants.

24. Additionally, because of Plaintiff's insistence that all churning activities within the Warren Hills office cease immediately, he also came to be held in disfavor by several of the agents working under him in the Warren Hills office who frequently met sales goals and increased their own compensation by engaging in churning activities.

New Jersey insurance law and regulations prohibit the practice that Young alleges. *See N.J.S.A.* 17B:30–6:

No person shall make any misleading representations or incomplete or fraudulent comparison of any insurance policies or annuity contracts or insurers for the purpose of inducing, or tending to induce, any person to lapse, forfeit, surrender, terminate, retain, or convert any insurance policy or annuity contract, or to take out a policy of insurance or annuity contract in another insurer.

*See also N.J.A.C.* 11:17A–2.8. The prohibited practice is apparently known as "churning" or "twisting." [2] *See* 16 *Appleman, Insurance Law and Practice* § 8644. *See also State ex rel. Metropolitan Life Ins. Co. v. Starcher,* 196 *W.Va.* 519, 474 *S.E.*2d 186, 188 (1996):

> Plaintiffs aver that MetLife engaged in a form of "churning" or "twisting" by improperly utilizing accumulated cash values, dividends, and interest in existing life insurance policies to finance the purchase of additional policies.

In lieu of an answer, defendant filed a motion to dismiss or stay plaintiff's lawsuit, invoking the arbitration provision of the U–4. Plaintiff opposed the motion on the ground that the U–4 was not a contract, and that even if it was, his claim fell under an express exception as a dispute involving the defendant's insurance business.

The four-page U–4 forms signed by Young both in 1982 and 1983 required his signature on each page. Page four begins with a heading printed in capital letters, white on a black background: "THE FOLLOWING SHOULD BE READ VERY CAREFULLY BY THE APPLICANT." The fifth numbered paragraph following that cautionary language reads as follows:

> I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations with which I register, as indicated in Question 8.

The U–4 is used by several securities-related organizations, and Question 8 (on page one) requires the applicant to specify the organization to which application is made. Young specified "NASD" and signed his name on each page. Young's notarized signature appears on page four, just below the "read-very-carefully" section that includes the arbitration provision. The second numbered paragraph of that section includes the following certification:

---

2 The headings of both *N.J.S.A.* 17B:30–6 and *N.J.A.C.* 11:17A–2.8 refer to the prohibited practice as "twisting."

I have read, understand and agree to abide by, comply with, and adhere to all the provisions, conditions and covenants of the statutes, constitutions, certifications of incorporation, by-laws and rules and regulations of the states and organizations *as they are and may be adopted, changed or amended from time to time* ....

(emphasis added).

Sections 1 and 8 of the NASD Code as they existed in 1982 and 1983 were amended in 1993. *See* 58 *FR* 45932. Those sections, with the 1993 deletions in brackets and additions underlined, read as follows:

Sec. 1 This Code of Arbitration Procedure is prescribed and adopted pursuant to Article VII, Section 1(a)(3) of the By–Laws of the National Association of Securities Dealers, Inc., (the Association) for the arbitration of any dispute, claim or controversy arising out of or in connection with the business of any member of the Association, or arising out of the employment or termination of employment of associated persons (s) with any member, with the exception of disputes involving the insurance business of any member which is also an insurance company:

(1) between or among members;

(2) between or among members and associated persons;

[2] (3) between or among members or associated persons and public customers, or others; and

[3] (4) between or among members, registered clearing agencies with which the Association has entered into an agreement to utilize the Association's arbitration facilities and procedures, and participants, pledgees or other persons using the facilities of a registered clearing agency, as these terms are defined under the rules of such a registered clearing agency.

 . . . .

Sec. 8 (a) Any dispute, claim or controversy eligible for submission under Part I of this Code between or among members and/or associated persons, and/or certain others, arising in connection with the business of such member(s) or in connection with the activities of such associated person(s), or arising out of the employment or termination of employment of such associated person(s) by and with such member, shall be arbitrated under this Code, at the instance of:

(1) a member against another member;

(2) a member against a person associated with a member or a person associated with a member against a member; and,

(3) a person associated with a member against a person associated with a member.

## II

██ Young challenges the enforceability of the arbitration pro-

vision on several grounds.[3] He contends that he has a statutory right to a jury trial of his CEPA and LAD claims and that he did not knowingly waive the right to jury trial. With respect to these arguments, the motion judge correctly concluded that plaintiff's arguments could not prevail.

A written agreement to arbitrate a dispute involving interstate commerce is "valid, irrevocable and enforceable" under the Federal Arbitration Act, 9 *U.S.C.A.* § 1 et seq. ("FAA"), "save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* § 2. The United States Supreme Court has addressed the apparent conflict between the statutory right to jury trial under a civil rights statute, the Age Discrimination in Employment Act, 29 *U.S.C.A.* § 621 et seq. ("ADEA"), and the arbitration provision of a securities registration application with the New York Stock Exchange ("NYSE"), holding the discrimination claim subject to compulsory arbitration. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 *U.S.* 20, 26, 111 *S.Ct.* 1647, 1652, 114 *L.Ed.*2d 26, 37 (1991) ("It is by now clear that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA.") The Supreme Court found nothing in the text or legislative history of the ADEA to suggest that Congress intended to bar a waiver of the right to a judicial forum. *Id.*, 500 *U.S.* at 28, 111 *S.Ct.* at 1653–54, 114 *L.Ed.*2d at 38, *citing Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.* 473 *U.S.* 614, 628, 105 *S.Ct.* 3346, 3354, 87 *L.Ed.*2d 444, 456 (1985).

We do not find plaintiff's reliance on the reasoning of *Prudential Ins. Co. of America v. Lai*, 42 *F.*3d 1299 (9th Cir.1994), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 61, 133 *L.Ed.*2d 24 (1995) to be

---

[3] Defendant informs us that the United States District Court for the District of New Jersey rejected the very same arguments with respect to the enforceability of the U–4 arbitration requirement in plaintiff's suit against Prudential alleging a violation of the Employee Retirement Income Security Act, 29 *U.S.C.A.* § 1001 ("ERISA"). Defendant cites Judge Clarkson Fisher's unreported opinion in that case, Civil No. 95–5883 (slip opinion) (D.N.J., April 2, 1996) solely for its precedential value. The Law Division judge's letter opinion of October 19, 1995 predates Judge Fisher's opinion.

persuasive. The 9th Circuit held that Prudential sales representatives did not knowingly waive their Title VII remedies for sexual harassment when they were required, as a condition of their hiring, to sign U–4 forms similar to Young's. Those plaintiffs

allege[d] that when they signed the U–4 form, they were told only that they were applying to take a test which was required for their employment by Prudential, and that they were simply directed to sign in the relevant place without being given an opportunity to read the forms. Arbitration was never mentioned, and plaintiffs were never given a copy of the NASD Manual, which contains the actual terms of the arbitration agreement.

[*Id.* at 1301].

Addressing *Gilmer,* the 9th Circuit noted:

The issue before us, however, is not whether employees may ever agree to arbitrate statutory employment claims; they can. The issue here is whether these particular employees entered into such a binding arbitration agreement, thereby waiving statutory court remedies otherwise available.

[*Id.* at 1303].

*Gilmer,* however, tells us that only if the statute or legislative history evidence an intention to preclude alternate forms of dispute resolution will arbitration agreements be unenforceable with respect to a statutory claim. 500 *U.S.* at 29, 111 *S.Ct.* at 1653–54, 114 *L.Ed.*2d at 39. Two years after *Lai,* the 9th Circuit in *Kuehner v. Dickinson & Co.,* 84 *F.*3d 316 (9th Cir.1996), without overruling *Lai,* held that the U–4 arbitration provision bound an employee asserting claims under the Fair Labor Standards Act.

The FAA preempts any state law purporting to invalidate an arbitration agreement involving interstate commerce. *See Allied–Bruce Terminix Companies, Inc. v. Dobson,* 513 *U.S.* 265, 115 *S.Ct.* 834, 130 *L.Ed.*2d 753 (1995); *Yale Materials Handling Corp. v. White Storage and Retrieval Systems, Inc.,* 240 *N.J.Super.* 370, 376, 573 *A.*2d 484 (App.Div.1990). In any event, there is no evidence in the text or legislative history of CEPA or LAD that members of the classes protected by those statutes cannot waive the right to jury trial by agreeing to arbitrate disputes with their employers. Indeed the New Jersey Arbitration Act, *N.J.S.A.* 2A:24–1, mirrors the FAA and provides that any provision to

arbitrate an existing or future controversy "shall be valid, enforceable and irrevocable, except upon such grounds as exist at law or in equity for the revocation of a contract."

Both the federal and state arbitration statutes have been held to express a strong policy favoring arbitration as a means of dispute resolution and to require liberal construction of contracts in favor of arbitration. *E.g., Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 *U.S.* 1, 24–25, 103 *S.Ct.* 927, 941, 74 *L.Ed.*2d 765, 785 (1983); *Marchak v. Claridge Commons, Inc.*, 134 *N.J.* 275, 281, 633 *A.*2d 531 (1993). Nevertheless, the scope of the arbitration, no less than the duty to arbitrate, is governed by the agreement of the parties. *See, e.g., First Options of Chicago, Inc. v. Kaplan*, 514 *U.S.* ——, ——, 115 *S.Ct.* 1920, 1924, 131 *L.Ed.*2d 985, 993 (1995) ("[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration."); *Mastrobuono v. Shearson Lehman Hutton Inc.*, 514 *U.S.* ——, —— n. 4, 115 *S.Ct.* 1212, 1217 n. 4, 131 *L.Ed.*2d 76, 86 n. 4 (1995); *Singer v. Commodities Corp. (U.S.A.)*, 292 *N.J.Super.* 391, 402, 678 *A.*2d 1165 (App.Div.1996). We have recently considered an employee's claim that his CEPA claim is not subject to the U–4's arbitration provision and concluded that the provision is valid, enforceable and requires the employee to arbitrate. *Singer v. Commodities Corp. (U.S.A.), supra*, 292 *N.J.Super.* 391, 678 *A.*2d 1165 (reversing the denial of defendant's motion to compel arbitration). *See also Bleumer v. Parkway Ins. Co.*, 277 *N.J.Super.* 378, 649 *A.*2d 913 (Law Div.1994).

■ Whether a contract exists is to be determined in accordance with state contract law. *See, e.g., First Options of Chicago, Inc. v. Kaplan, supra*, 514 *U.S.* at ——, 115 *S.Ct.* at 1924, 131 *L.Ed.*2d at 993; *Volt Info. Sciences, Inc. v. Leland Stanford Junior Univ.*, 489 *U.S.* 468, 474, 109 *S.Ct.* 1248, 1253, 103 *L.Ed.*2d 488, 497 (1989). Young's reliance upon New Jersey contract law to avoid the arbitration agreement is unavailing. In opposition to Prudential's motion, Young contended that he was presented with

the U–4 without sufficient time to read it carefully; that he neither noticed the arbitration provision nor contemplated that the document was anything more than an application to take the registration exam; that no one at Prudential called his attention to the arbitration provision; that he was never given a copy of the U–4 that he signed; and that he was never provided with the NASD rules and regulations referred to by the arbitration clause.

Young contends on appeal that Prudential committed "fraud in the factum and deceit," that he never agreed to arbitrate future statutory claims or to waive the right to jury trial of such claims, and that he was entitled to a plenary hearing to determine whether his signatures on the U–4's constituted such an agreement. There was, however, sufficient undisputed evidence from which the motion judge determined, under the summary judgment model plaintiff suggests, *Brill v. Guardian Life Ins. Co. of America*, 142 *N.J.* 520, 666 *A.2d* 146 (1995), that no reasonable factfinder could conclude that Young did not knowingly sign the registration application and its arbitration agreement. The judge concluded:

> [I]t is undisputed that plaintiff signed the U4, agreed to be bound by its terms, including the arbitration term, and agreed to be bound by any amendments to the terms, including the added language clarifying the inclusion of employment disputes within the clause.

It is indeed undisputed that plaintiff himself entered information and his signature on each page of the four-page U–4 forms, in 1982 and again in 1983. The caution "READ CAREFULLY" appears in larger, white on black type, only a few inches above six numbered paragraphs that include, as paragraph five, the arbitration clause. These undisputed facts do not permit the conclusion that Young was prevented from reading what he signed. Young does not dispute that he signed documents acknowledging, as office manager, that the NASD Manual was to be maintained in his field office. Although plaintiff contends on this appeal that he believed he was merely completing an application to take a test and not entering into a contract to arbitrate future disputes, the U–4 on its face is more than a test application.

Plaintiff complains that defendant never advised him or alerted him to the arbitration provision in the U–4. No such obligation exists where the provision is not hidden. *Compare Correa v. Maggiore,* 196 *N.J.Super.* 273, 281, 482 *A.*2d 192 (App.Div.1984) ("To support a claim [for concealment of material defects in real property], however, the defective condition must be latent and not reasonably observable to the purchaser.") Failing to read a contract does not excuse performance unless fraud or misconduct by the other party prevented one from reading. *Berman v. Gurwicz,* 178 *N.J.Super.* 611, 617–18, 429 *A.*2d 1084 (Ch.Div.1981). Plaintiff's claims of fraud and deceit in obtaining his signature, in light of the undisputed facts, cannot establish "fraud in the factum" as plaintiff claims. *See Amsterdam v. DePaul,* 70 *N.J.Super.* 196, 175 *A.*2d 219 (App.Div.1961). Neither do the facts permit a finding of legal or equitable fraud as defined in *Baldasarre v. Butler,* 254 *N.J.Super.* 502, 520–21, 604 *A.*2d 112 (App. Div.1992) *aff'd in part and rev'd in part on other grounds,* 132 *N.J.* 278, 625 *A.*2d 458 (1993).

■ Plaintiff also contends that the 1993 amendments do not apply to him because he signed the U–4 forms in 1982 and 1983. Young argues that because his CEPA claim had not arisen when he signed the U–4, he could not have knowingly waived the right to a jury trial for such a claim. We find no merit to that contention in light of the express promise in paragraph two of the "READ CAREFULLY" section of the U–4, quoted in full above, to "abide by, comply with, and adhere to all the provisions . . . , by-laws and rules and regulations of the . . . [NASD] *as they are and may be* adopted, changed or *amended from time to time. . . .*" (emphasis added).

■ New Jersey law does not support plaintiff's argument that because the U–4 is a form document, and he had no choice about signing it or negotiating its terms, it is unenforceable as a contract of adhesion. *See Rudbart v. North Jersey Dist. Water Supply Comm'n,* 127 *N.J.* 344, 353–56, 605 *A.*2d 681, *cert. denied,* 506 *U.S.* 871, 113 *S.Ct.* 203, 121 *L.Ed.*2d 145 (1992):

The project notes involved here unquestionably fit our definition of contracts of adhesion. That is, they were presented to the public on standardized printed forms, on a take-it-or-leave-it basis without opportunity for purchasers to negotiate any of the terms. *But the observations that the notes fit the definition of contracts of adhesion is the beginning, not the end, of the inquiry: we must now determine as a matter of policy whether to enforce the unilaterally-fixed terms of the notes.*

[*Id.* at 354, 605 A.2d 681 (emphasis added).]

. . . .

Thus, in determining whether to enforce the terms of a contract of adhesion, courts have looked not only to the take-it-or-leave-it nature or the standardized form of the document but also to the subject matter of the contract, the parties' relative bargaining position, the degree of economic compulsion motivating the "adhering" party, and the public interest affected by the contract.

[*Id.* at 356, 605 A.2d 681.]

In *Rudbart*, the majority cited three policy considerations favoring enforcement of the contract of adhesion. First, investors had the choice of "a vast selection of alternative equity and debt instruments. . . . [and] were not driven to accept the Commission's notes because of a monopolistic market or any other economic constraint." *Id.* at 356, 605 A.2d 681. Second, enforcement "advances rather than contravenes well-established and important public policies." *Id.* at 357, 605 A.2d 681. Third, "judicial review of the fairness of negotiable securities would be inconsistent with federal and state securities law." *Id.* at 358, 605 A.2d 681.

Analysis of the U–4 in light of the circumstances of Young's signing and the factors suggested by *Rudbart* supports enforcement of its arbitration provisions even if it is literally a contract of adhesion. First, while employees of NASD members apparently have no bargaining power and no choice with respect to signing the U–4, the United States Supreme Court has determined that unequal bargaining power does not preclude enforcement of the arbitration provision. *Gilmer, supra,* 500 *U.S.* at 33, 111 *S.Ct.* at 1655–56, 114 *L.Ed.*2d at 41. The Court in *Gilmer* left open the possibility that fraud or coercion in obtaining the employee's agreement might avoid its terms based on contract law in individual cases pursuant to section 2 of the FAA. *Id.,* 500 *U.S.* at 33, 111 *S.Ct.* at 1655–56, 114 *L.Ed.*2d at 41. However, in light of the fact

that Gilmer, like Young, was required to sign the registration application as a condition of his employment, the Supreme Court obviously contemplated avoidance of the arbitration clause only upon circumstances substantially more egregious than the ordinary economic pressure faced by every employee who needs the job.

Second, there is a strong public policy expressed in the substantial federal and state authority for enforcement of arbitration agreements. *See, e.g., Dean Witter Reynolds, Inc. v. Byrd,* 470 *U.S.* 213, 221, 105 *S.Ct.* 1238, 1242, 84 *L.Ed.*2d 158, 165 (1985); *Bender v. A.G. Edwards & Sons, Inc.,* 971 *F.*2d 698, 699 (11th Cir.1992); *Mago v. Shearson Lehman Hutton Inc.,* 956 *F.*2d 932, 935 (9th Cir.1992); *Alford v. Dean Witter Reynolds, Inc.,* 939 *F.*2d 229 (5th Cir.1991); *Singer v. Commodities Corp. (U.S.A.), supra,* 292 *N.J.Super.* 391, 678 *A.*2d 1165. *See also Shearson/American Express, Inc. v. McMahon,* 482 *U.S.* 220, 226, 107 *S.Ct.* 2332, 2337, 96 *L.Ed.*2d 185, 193 (1987).

Third, the overall subject matter—registration and regulation of persons selling securities to the public—is already subject to review and oversight by the Securities and Exchange Commission ("SEC"). *See* 15 *U.S.C.A.* § 78*o*–3(g), (h). The widespread use of the U–4 makes its uniform interpretation and enforcement a matter of substantial public interest. Accordingly, Young is bound by his agreement to arbitrate in accordance with NASD rules.

## III

■ Because we hold Young bound by his agreement to arbitrate disputes with Prudential in accordance with NASD rules, we look to the explicit exception provided by Section 1 of those rules for "disputes involving the insurance business of any member which is also an insurance company." Interpretation and construction of a contract is a matter of law for the court subject to *de novo* review. See *Bradford v. Kupper,* 283 *N.J.Super.* 556, 583, 662 *A.*2d 1004 (App.Div.1995), *certif. denied,* 144 *N.J.* 586, 677

*A.*2d 759 (1996). Our analysis of the NASD rules incorporated by reference in the U–4 persuades us that the insurance exception applies to Young's CEPA claim.[4]

Defendant has brought to our attention the decisions of numerous federal circuit courts of appeals and district courts, many unreported, rejecting arguments on behalf of insurance-company employees that the "insurance exception" permits them to choose a judicial forum and precludes mandatory arbitration. The interpretation of federal law by federal courts may be persuasive in a given case, and "should be accorded due respect"; nevertheless, such rulings, other than by the United States Supreme Court, are not binding upon a state appellate court. *Dewey v. R.J. Reynolds Tobacco Co.*, 121 *N.J.* 69, 79–80, 577 *A.*2d 1239 (1990). Of the many decisions cited to us, few involve facts truly similar to those before us.

The case factually closest to Young's is also the most compelling. *In re the Prudential Ins. Co. of America Sales Practices Litigation*, 924 *F.Supp.* 627 (D.N.J.1996) (motion to compel arbitration denied). There Judge Wolin concluded, as do we, that the insurance exception—that provision of the Code that excludes from arbitration those disputes *"involving the insurance business of any member which is also an insurance company"*—precludes mandatory arbitration of employee claims against an insurance company employer where the core of the claim is an allegation that defendant's conduct of its insurance business violates law or public policy. *Id.* at 640–42. The motion in *In re Prudential* was:

> part of a large group of cases against defendant Prudential Insurance Company of America ("Prudential") which have been transferred to this Court for coordinated pretrial proceedings under 28 *U.S.C.* § 1407 pursuant to the order of the Judicial Panel on Multidistrict Litigation. The majority of these cases involve allegations by current and former Prudential policyholders that the company engaged in

---

[4] Young does not argue that his LAD claim falls under this exception and we therefore do not address that question. Where some causes of action are arbitrable and others are not, they can be heard in different forums. *See Dean Witter Reynolds, Inc. v. Byrd, supra,* 470 *U.S.* at 217, 105 *S.Ct.* at 1240, 84 *L.Ed.*2d at 163.

various illegal sales practices. The cases at issue on this motion are part of a smaller subset of cases, in which certain former Prudential sales agents allege that Prudential took adverse employment actions against them because they refused to participate in these illegal practices.

[924 *F.Supp.* at 631.]

The defense relies upon a number of cases, both published and unpublished, that hold the insurance exception inapplicable. The great majority of those cases address what we deem a non-issue. *E.g., Kidd v. Equitable Life Assur. Soc'y. of the United States,* 32 *F.*3d 516 (11th Cir.1994) (Title VII race discrimination claim); *Wojcik v. Aetna Life Ins. & Annuity Co.,* 901 *F.Supp.* 1282 (N.D.Ill.1995) (broker's wrongful discharge claim alleges harassment); *O'Donnell v. First Investors Corp.,* 872 *F.Supp.* 1274 (S.D.N.Y.1995) (fraud and contract claims); *Prudential Ins. Co. of America v. Shammas,* 865 *F.Supp.* 429 (W.D.Mich.1993) (state law discrimination claims). That is, they tell us what is not debatable—that the mere fact that the employer is an insurance company does not make the dispute one "involving the insurance business."

There are, however, a handful of cases that decline to apply the insurance exception to disputes not unlike the case before us. In *Armijo v. Prudential Ins. Co. of America,* 72 *F.*3d 793 (10th Cir.1995) (insurance exception not applicable), Prudential's defense to plaintiff's Title VII claim was that plaintiff's own violation of insurance law caused the company to take adverse employment actions against him. *Armijo* has been distinguished because insurance law violations were raised only in defense of plaintiff's affirmative claim, *In re Prudential, supra,* 924 *F.Supp.* at 641–42.

In *Vitone v. Metropolitan Life Ins. Co.,* 943 *F.Supp.* 192 (1996) *reconsid. denied,* —— *F.Supp.* ——, 1997 WL 24850 (D.R.I.1997), the plaintiff's suit alleged, among a number of common law and statutory tort claims, that he had been terminated for complaining and threatening to report alleged "compliance irregularities in the company's operations.... [in violation of] the Rhode Island's Whistleblowers' Protection Act". *Id.* at 194. Addressing the

insurance business exception, the district court in Rhode Island distinguished *In re Prudential* on the ground that the claims there required "a comprehensive review of the defendant's insurance business in order the resolve the employment claims." *Id.* at 198. We fail to see how Young's claim, or Vitone's, requires a less "comprehensive review," unless the *Vitone* court intended that the number of claimants should determine the applicability of the insurance exception.

In *Metropolitan Life Ins. Co. v. Lindsay,* 920 S.W.2d 720 (Tex.Ct.App.1996), several former salesmen who had either been fired or accused of improper marketing actions, allegedly in retaliation for questioning and threatening to "blow the whistle" on the company's marketing practices, *id.* at 721, sued the insurance company on a variety of tort and contract theories. The Texas intermediate appellate court rejected the employees' contention that their claims were not subject to mandatory arbitration because of the insurance exception. In so holding, the court noted that "most of the cases that address this issue are unreported opinions from the federal district courts," *id.* at 723 n. 2, and reasoned that

> This case is essentially an employment dispute, not a case about MetLife's insurance business. At a trial on the merits, the trial court will not necessarily be required to determine whether the marketing practices were in fact illegal; rather, the court must decide whether MetLife required the plaintiffs to follow the marketing practices or whether the plaintiffs followed these practices without authority from MetLife. Thus, the primary issue is how MetLife treated its employees. MetLife's marketing practices are only a secondary issue.

> [*Id.* at 724.]

We decline to follow the reasoning of the courts in *Vitone* and *Lindsay,* which fail to distinguish claims like Young's from termination cases that do not implicate the defendant's insurance business. *Vitone* and *Lindsay* focus only on the defendant insurance company's wrongful conduct toward plaintiff, ignoring the fact that defendant's conduct toward its insurance clients was squarely in issue.

In *Trumbetta v. Metropolitan Life Ins. Co.*, 1994 WL 481152, 129 *Lab. Cas.* (CCH) ¶ 57,786, 2 *Wage & Hour Cas.*2d (BNA) ¶ 542 (E.D.Pa.1994), plaintiff brought suit against his insurance company employer alleging RICO and defamation claims, intentional interference with contractual relations and violations of state labor laws. The court's opinion denying application of the insurance exception is frequently cited in insurance exception cases. However, discussion of the issue is so attenuated in that opinion as to preclude useful comparison:

> Although the plaintiff in this case made some general allegations concerning the defendant's insurance practices, ... the actual basis for each of his claims is the conduct of his supervisors that led to his constructive discharge.
>
> [*Id.* at 2.]

Unlike *Trumbetta*, Young makes very specific allegations of defendant's improper insurance practices. If the plaintiff in *Trumbetta* made no specific allegations which, if proven, would have established violations of insurance law, then the decision is consistent with our decision today.

The critical distinction between the several no-insurance-exception cases on the one hand, and *In re Prudential* and the instant case on the other, is that we deal here with more than a statutory civil rights claim against an employer that happens to be an insurance company. Indeed this is no "ordinary" or "garden variety" employment dispute. *See In re Prudential, supra,* 924 *F.Supp.* at 640. Although the existence of multi-district litigation and the risk of "inconsistent results" was cited by Judge Wolin as an additional ground for applying the insurance exception, 924 *F.Supp.* at 640, the involvement of Prudential's insurance business is no less a factor in this individual suit.

Young's complaint sets forth the elements of a "whistleblower" claim: that he reasonably believed Prudential was engaging in an unlawful insurance practice, along with an additional policy designed to cover-up the original practice; that he complained to his superiors about both practices, attempted to put a stop to those practices within his office, and refused to participate in the cover-

up; and that as a result of such protected activity he was subjected to undue pressure and adverse employment decisions, including termination. *See N.J.S.A.* 34:19–3 a., c(1) and (3); *Abbamont v. Piscataway Twp. Bd. of Ed.,* 138 *N.J.* 405, 423–24, 650 *A.*2d 958 (1994); *Young v. Schering Corp.,* 275 *N.J.Super.* 221, 233, 645 *A.*2d 1238 (App.Div.1994), *aff'd,* 141 *N.J.* 16, 660 *A.*2d 1153 (1995).

The motion judge erred in concluding that the insurance business exception applies only to disputes between insurance companies. The express language of Section 1 of the NASD Code leads us to a different conclusion. Section 1 was amended in 1993 to "clarify an existing ambiguity" and put to rest arguments that employment related cases, including those arising out of employment termination, were not covered by the arbitration clause in the U–4. *See* 58 *FR* 45932. As quoted in full above, Section 1 provides:

> This Code ... is prescribed ... for the arbitration of any dispute, claim or controversy arising out of or in connection with the business of any member of the Association, <u>or arising out of the employment or termination of employment of associated persons (s) with any member,</u> with the exception of disputes involving the insurance business of any member which is also an insurance company....
>
> [1993 amendment underlined.]

The 1993 amendment to NASD Code Section 1 added the words describing employment disputes in a parallel construction to the words describing arbitrable disputes generally. The insurance exception language follows, and clearly modifies both of the preceding parallel phrases. There is no other logical interpretation of amended section 1, notwithstanding the cases holding to the contrary. If employment disputes were not intended to be subject to the "exception of disputes involving the insurance business...." and if that exception was intended to apply solely to "any dispute, claim or controversy" other than one involving employment, the phrase added in 1993 would have followed rather than preceded the "exception" phrase. Section 1 would then likely have read:

> This Code is prescribed ... for the arbitration of any dispute, claim or controversy (a) arising out of or in connection with the business of any member of the

Association, with the exception of disputes involving the insurance business of any member which is also an insurance company *or (b)* arising out of the employment or termination of employment of associated persons (s) with any member,

Dictum in a recent Second Circuit opinion supports our conclusion that the insurance exception is not limited to disputes involving "certain parties." *See Thomas James Assocs., Inc. v. Jameson,* 102 *F.*3d 60, 64 (2d Cir.1996) (provision in employment agreement between NASD securities broker and employee registered with NASD, purporting to waive employee's right to arbitrate under NASD rules, is void as against public policy), *citing In re Prudential, supra,* with approval.

To hold the insurance exception inapplicable on these facts is to conclude that no individual employee's dispute with an insurance company employer can ever meet the definition of a dispute "involving the insurance business" of the employer. We cannot imagine a claim that more clearly involves the insurance business of the defendant than plaintiff's.

It is true that CEPA does not require proof that the practices Young alleges are actually unlawful or against public policy. *Mehlman v. Mobil Oil Corp.,* 291 *N.J.Super.* 98, 123, 676 *A.*2d 1143 (App.Div.), *certif. granted,* 147 *N.J.* 264, 686 *A.*2d 764 (1996). Nevertheless, those practices are at the heart of this case. If the evidence proves that Prudential's behavior was unlawful, the reasonableness of Young's perception will have been established. Even if the evidence does not establish conduct that is unlawful or in violation of public policy, Young's perception may be found to have been reasonable. *See Delran Educ. Ass'n. v. Delran Bd. of Educ.,* 277 *N.J.Super.* 538, 543–44, 650 *A.*2d 7 (App.Div.1994). Of course, if Young's belief, however sincere, was objectively unreasonable, his actions are not protected activity and his CEPA claim must fail. Whether Young acted upon "reasonable belief" cannot be determined without "involving the insurance business" of Prudential. Thus although the lawsuit is not an enforcement proceeding, and although the lawfulness of the company's practice is not the ultimate issue, it is a critical issue that is truly at the core of this whistleblower case.

Young's claim falls outside the insurance exception only if we conclude that no employee's claim can ever be subject to that exception. Indeed, that is what the motion judge concluded:

> Nor are we persuaded that the so-called insurance exception on which plaintiff relies applies to this case. The dispute here is at its heart an employment dispute in which plaintiff claims that he was wrongfully discharged and discriminated against in retaliation for what he describes as whistle blowing. The exception relating to insurance and the business of insurance, however, must of necessity relate to disputes about the practices of an insurance company *raised between insurance companies themselves* and not to the alleged retaliation visited on an employee who calls attention to his insurance company ·employer's allegedly unlawful insurance practice. It is clear that the essence of plaintiff's claim is wrongful discharge and discrimination, not a dispute relating in any meaningful way to insurance.

(emphasis added).

The judge relied upon *Trumbetta v. Metropolitan Life Ins. Co., supra*, whose facts are similar to those before us, and *Prudential Ins. Co. of America v. Shammas, supra*, whose facts are readily distinguishable. We agree with Judge Wolin in *In re Prudential* that there is "no support in the text or history of the NASD Code for the ... finding that the exception applies only to disputes between insurance companies themselves." 924 *F.Supp.* at 641. As stated in *Wojcik, supra*, 901 *F.Supp.* at 1292, upon which defendant relies, "[T]o successfully trigger the exception, a plaintiff must allege unlawful insurance practices and not simply wrongful conduct directed toward the plaintiff." Plaintiff has done so.

We reverse the order of dismissal as to plaintiff's CEPA claim and remand for trial and any appropriate pretrial proceedings. The order dismissing plaintiff's LAD claim, without prejudice, is affirmed.