707 A.2d 209

DAVID FASTENBERG, PLAINTIFF–RESPONDENT, v. THE PRU-
DENTIAL INSURANCE COMPANY OF AMERICA, ARTHUR F.
RYAN, WILLIAM F. YELVERTON, DEFENDANTS–APPEL-
LANTS.

Superior Court of New Jersey
Appellate Division

Argued January 14, 1998—Decided April 8, 1998.

Before Judges MUIR, Jr., KESTIN and CUFF.

*John J. Peirano,* argued the cause for appellants (*Carpenter, Bennett & Morrissey,* attorneys; Mr. *Peirano,* of counsel and on the brief; *James P. Lidon* and *Christopher J. Dalton,* on the brief).

*Peter J. Frazza,* argued the cause for respondent (*Budd, Larner, Gross, Rosenbaum, Greenberg & Sade,* attorneys; *Donald P. Jacobs,* on the brief).

The opinion of the court was delivered by

CUFF, J.A.D.

In this case, we granted leave to appeal to review whether plaintiff's wrongful discharge and defamation claims against his former insurance company employer may proceed in a court of law or must be submitted to arbitration. We conclude that his claims do not fall within the "business of insurance" exception to the arbitration agreement executed by the parties and we reverse.

Plaintiff, David Fastenberg, began his employment with defendant, The Prudential Insurance Company of America (Prudential), in 1974, and he remained employed by Prudential until his termination in 1996. When terminated, plaintiff was Senior Vice President, Greater Southern Operations, reporting directly to the President of the Insurance and Financial Services Division. Immediately before his termination, his office was transferred from

Jacksonville, Florida to South Plainfield, New Jersey as part of a management reorganization.

While plaintiff attended a Prudential conference outside of Florida, his secretary in Jacksonville packed the contents of his office for shipment to New Jersey. His files and other materials were shipped to New Jersey in May and June 1996. Plaintiff left Jacksonville on June 4, 1996, and reported to his new office in South Plainfield the next day. Soon after his move, plaintiff learned that some of the files from his office had been discarded by his secretary in Jacksonville. He contends that he never instructed his secretary to discard or destroy any files in his office.

On August 14, 1996, plaintiff was terminated by Prudential for failing to enforce Prudential's document retention policy. According to Prudential, this resulted in the destruction of documents during the course of plaintiff's move from Florida to New Jersey. Simultaneously, Arthur Ryan, Chairman of the Board and Chief Executive Officer of Prudential, distributed a written statement throughout Prudential which asserted that documents compiled "[i]n response to subpoenas issued by the Florida Attorney General and Florida Department of Insurance" had been "discarded in the course of a reorganization and relocation of staff in [the Jacksonville] office to New Jersey." Ryan further stated that plaintiff was fired "for failing to abide by and enforce company directives to preserve documents."

Plaintiff contends that this statement was also issued to the mass media including *The Star–Ledger*, *The Wall Street Journal*, and *The New York Times*. Each of these publications reported that plaintiff had been fired for destroying documents important to a multi-state investigation concerning marketing abuses in the insurance industry. In his complaint, plaintiff asserts that defendants Prudential, Ryan, and William Yelverton defamed him, conspired against him and wrongfully discharged him. Alternatively, plaintiff claims that defendants negligently misrepresented his responsibility for the destruction of company documents.

Defendants filed a motion to compel arbitration of plaintiff's claims. The motion judge denied this application reasoning that there was at least a factual dispute whether plaintiff's claims involve unlawful insurance practices. Implicit in this ruling was a conclusion that plaintiff's claims, if proved, and the reasons for the termination of plaintiff's employment implicated the "business of insurance" exception of the arbitration agreement. The motion judge stated, "[d]efendant's stated reason for Fastenberg's termination involves aspects of its insurance business which are undisputedly under investigation for illegal and fraudulent activities." We granted leave to appeal the order and stayed any further proceedings in the Law Division pending resolution of this appeal.

In the 1990's, holders of Prudential insurance policies and state insurance regulators filed suit and regulatory proceedings against Prudential, claiming it had engaged in deceptive sales practices. In particular, Prudential was accused of engaging in "churning," an illegal practice involving misrepresentations made by sales agents to induce policy holders to purchase additional and unnecessary insurance policies. As a result, the New Jersey Department of Insurance invited other states to join in a multi-state investigation of Prudential. At least thirty jurisdictions joined in the investigation.

This multi-state life insurance task force undertook a "market conduct examination" of Prudential. Hundred of thousands of transactions were analyzed, and hundreds of individuals were interviewed. Pursuant to this investigation, a report was generated on July 9, 1996.

In conjunction with the investigation of Prudential's sales practices, state regulators served Prudential with subpoenas requiring Prudential to produce pertinent records and documents. Fastenberg alleges that, in response to these subpoenas, all of his files were copied under the supervision of Prudential's Law Department or outside counsel.

At the time Fastenberg filed suit, Prudential had entered into settlement agreements with most of the state regulators from the

approximately thirty different jurisdictions, and was in the process of attempting to settle some of the pending suits brought on behalf of its policyholders. According to reports, Prudential was fined a record $35 million for its negligent supervision and training, and for failing to discipline perpetrators of fraudulent sales tactics. Prudential was also required to pay approximately $1 billion in compensation to buyers of life insurance.

In 1987, while employed by Prudential, plaintiff signed a Uniform Application for Securities Industry Registration (Form U–4). Pursuant to the U–4, plaintiff agreed to

> arbitrate any dispute, claim or controversy that may arise between [him] and [his] firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations with which [he] register[ed], as indicated in item 10 as may be amended from time to time.

Under item 10, the application indicates registration with the National Association of Securities Dealers ("NASD").

The NASD Code of Arbitration Procedure provides for

> the arbitration of any dispute, claim, or controversy ... arising out of the employment or termination of employment of associated person(s) with any member, with the exception of disputes involving the insurance business of any member which is also an insurance company:
>
> ....
>
> (2) between or among members and associated persons;
>
> (3) between or among members or associated persons and public customers, or others;....

In general, arbitration is the preferred forum for resolving contract disputes. *See Barcon Assocs. v. Tri–County Asphalt Corp.*, 86 *N.J.* 179, 186, 430 *A.*2d 214 (1981). Consistent with this principle, the Legislature has authorized the implementation of binding agreements to arbitrate. *N.J.S.A.* 2A:24–2. Moreover, an agreement to arbitrate should be read "liberally to find arbitrability if reasonably possible." *J. Baranello & Sons, Inc. v. Davidson & Howard Plumbing & Heating, Inc.*, 168 *N.J.Super.* 502, 507, 403 *A.*2d 919 (App.Div.), *certif. denied,* 81 *N.J.* 340, 407 *A.*2d 1214 (1979); *Young v. Prudential Ins. Co. of Am.,* 297 *N.J.Super.* 605, 617, 688 *A.*2d 1069 (App.Div.) ("Both federal and state arbitration statutes have been held to express a strong policy

favoring arbitration as a means of dispute resolution and to require liberal construction of contracts in favor of arbitration."), *certif. denied,* 149 *N.J.* 408, 694 *A.*2d 193 (1997). Thus, "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Singer v. Commodities Corp. (U.S.A.),* 292 *N.J.Super.* 391, 405, 678 *A.*2d 1165 (App.Div.1996) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 *U.S.* 574, 582–83, 80 *S.Ct.* 1347, 1352–53, 4 *L.Ed.*2d 1409, 1417 (1960)).

Our policy in favor of enforcement of agreements to arbitrate disputes is consonant with federal law, as articulated in federal case law and the Federal Arbitration Act, 9 *U.S.C.A.* §§ 1–307. The Supreme Court of the United States has articulated a two-step inquiry to be utilized when a court is asked to compel arbitration. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 *U.S.* 614, 105 *S.Ct.* 3346, 87 *L.Ed.*2d 444 (1985). First, the court must "determine whether the parties agreed to arbitrate that dispute." *Id.* at 626, 105 *S.Ct.* at 3353, 87 *L.Ed.*2d at 454; *see also Singer, supra,* 292 *N.J.Super.* at 402, 678 *A.*2d 1165. Second, the court must "consider[ ] whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims." *Mitsubishi Motors, supra,* 473 *U.S.* at 628, 105 *S.Ct.* at 3355, 87 *L.Ed.*2d at 456; *Singer, supra.*

■ Interpretation and construction of a contract is a matter of law for the court subject to *de novo* review. *See Bradford v. Kupper Assocs.,* 283 *N.J.Super.* 556, 583, 662 *A.*2d 1004 (App.Div. 1995), *certif. denied,* 144 *N.J.* 586, 677 *A.*2d 759 (1996). The relevant provision in need of plenary interpretation is the portion of the NASD Code of Arbitration Procedure providing for

the arbitration of any dispute, claim, or controversy ... arising out of the employment or termination of employment of associated person(s) with any member, *with the exception of disputes involving the insurance business of any member which is also an insurance company:*

[emphasis added.]

NASD's rationale for excluding insurance-only claims from its arbitration system is articulated in the following statement:

[T]he number of insurance-only claims involving insurance companies is so disproportionately large in relation to their securities business that to include such claims would unduly burden the arbitration system. In addition, the inclusion of such claims could result in a requirement to arbitrate matters that are intrinsically insurance, that is, matters with respect to which the [NASD] does not believe it should mandate arbitration.

[National Ass'n of Secs. Dealers, Inc.; Proposed Rule Change, 44 Fed.Reg. 75,255 (1979).]

The "insurance business" exception and the "intrinsically insurance" language in the NASD explication of the exception has led some courts to delve into the facts of each case to determine whether the insurance practices of the employer is a core ingredient or is inextricably involved in the employee's claims against the insurance company employer. We adopted this approach in *Young, supra.*

In *Young,* we noted the plaintiff alleged specific complaints about Prudential's improper insurance practices. Young claimed that, because of his open criticism of Prudential's "churning" policy and Prudential's ensuing cover-up, he suffered depression, was placed on probation, and was constructively terminated. *Id.* at 609, 688 *A.*2d 1069. Thus, this court held that Young's claims involved more than an "ordinary" employment dispute. We found:

Young's complaint sets forth the elements of a "whistleblower" claim: that he reasonably believed Prudential was engaging in an unlawful insurance practice, along with an additional policy designed to cover-up the original practice; that he complained to his superiors about both practices, attempted to put a stop to those practices within his office, and refused to participate in the cover-up; and that as a result of such protected activity he was subjected to undue pressure and adverse employment decisions, including termination.

[*Id.* at 625–26, 688 *A.*2d 1069.]

Therefore, we concluded that Young's claims "clearly involve[d] the insurance business of the defendant." *Id.* at 627, 688 *A.*2d 1069.

On the other hand, in *In re Prudential Ins. Co. of Am. Sales Practice Litig.,* 133 *F.*3d 225 (3d Cir.1998), a case in which the salesmen's claims were akin to the claims in *Young,* the court did

not engage in a detailed factual analysis to determine whether those claims clearly involved the insurance business of the employer. In fact, it specifically rejected the "intrinsically insurance" or "insurance-only" test. *Id.* at 233. Rather, in the absence of clear guidance concerning the meaning of the term "business of insurance" or "intrinsically insurance," the court deferred to the presumption in favor of arbitration. Judge Seitz said:

> We ultimately cannot say with positive assurance that the language of Form U–4 and the NASD Code, as well as their drafting histories, indicate the parties' desire not to arbitrate employment disputes that require the resolution of an insurance business issue. There is only one clear expression of intent here—that employment disputes are subject to arbitration while "intrinsically insurance" claims are not. Because this court cannot say with certainty what is meant by "intrinsically insurance" claims, and whether it embraces employment disputes, our mandate is clear: a presumption in favor of arbitration applies and doubts in construction are resolved against the resisting parties.

> [*Id.* at 234.]

Interestingly, in his partial dissent, Judge Greenberg predicted that a court of this State faced with similar employee claims would follow this court's decision in *Young*. *Id.* at 236. He may be correct; however, *Young* does not bar arbitration of plaintiff's claims.

Here, unlike in *Young*, plaintiff's claims are not in the nature of "whistleblower" claims. He has not asserted that he disagreed with or was forced to participate in a corporate activity which he believed was illegal, fraudulent or unconscionable business behavior. Rather, when stripped to its essentials, plaintiff's employer claims that he was fired for violating or allowing others to violate corporate policies concerning document retention, and plaintiff asserts that it is not so. These claims could occur in any industry. The unlawful sales practices of the employer provide some context for the development and enforcement of the document retention policy. However, the determination of whether plaintiff was wrongfully discharged will not turn on whether his employer did or did not engage in unlawful sales practices.

Finding no basis to ignore the agreement to arbitrate this employment dispute, we reverse the August 15, 1997 order deny-

ing defendants' motion to dismiss and to compel arbitration; and we remand for entry of an order compelling the submission of plaintiff's claims to arbitration.

Reversed and remanded.